AMERCO, Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 1562–80. Filed April 26, 1984.

*Stephen E. Silver* and *Brad S. Ostroff,* for the petitioners.
*David W. Otto*, for the respondent.

STERRETT, *Judge*: In his notice of deficiency dated November 2, 1979, respondent determined deficiencies in petitioner's Federal income taxes for the taxable years ended March 31, 1973, and March 31, 1974, in the respective amounts of $305,499.34 and $2,484.48. After concessions by the parties, the sole issue remaining for decision is whether, pursuant to sections 38 and 48(d), I.R.C. 1954, U-Haul International, a subsidiary corporation of petitioner, is entitled to claim an investment tax credit on certain fleet owners' trailers, trucks, handtrucks, and towbars placed in the U-Haul rental system during the fiscal year ended March 31, 1973.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioner Amerco is a Nevada corporation and is the parent corporation and sole stockholder of U-Haul International. The L. S. Shoen family owns 94 percent of the capital stock of Amerco. Amerco filed a consolidated Federal income tax return, along with 319 of its subsidiary corporations, for its fiscal year ended March 31, 1973, with the Internal Revenue Service Center at Ogden, Utah.

U-Haul International is an Oregon corporation, incorporated on February 5, 1951, under a different name. The prior legal names of U-Haul International and the periods such names were in effect are as follows:

| Name | Period |
|------|--------|
| Arcoa Auditing Co | Feb. 5, 1951 – Dec. 6, 1951 |
| Arcoa, Inc | Dec. 7, 1951 – Mar. 19, 1970 |
| Arcoa International, Inc | Mar. 20, 1970 – Dec. 13, 1970 |
| Advanced Management Engineering and Research Co | Dec. 14, 1970 – Dec. 19, 1972 |
| Amerco, Inc | Dec. 20, 1972 – Jan. 17, 1977 |
| U-Haul International[1] | Jan. 17, 1977 – to date |

During the fiscal year in question, Amerco was primarily a holding company, controlling wholly owned subsidiary corporations that comprised the functional elements of the U-Haul equipment rental system. The main business of the U-Haul system is to provide trailers, trucks, handtrucks, and towbars to the public on a rental basis for use in moving personal property.

The history of the U-Haul rental system dates back to 1945. At some time during that year, Mr. L. S. Shoen was discharged from the Navy and needed to move his personal belongings from San Diego the Portland. Being short on funds, Mr. Shoen attempted to rent a trailer one way from San Diego to Portland but found that all trailer rentals required the return of the rented trailer to the place of rental. Accordingly, Mr. Shoen decided to purchase a trailer with which to transport his belongings. His experience gave Mr. Shoen the idea of establishing a one-way trailer rental system throughout the United States.

Mr. Shoen began his business by building trailers himself and placing them for public rentals at service stations in the Portland area. The business, which was incorporated in 1948, was highly successful and, by 1953, dealerships had been established in most States.

As demand for U-Haul trailers increased, the need for financing to expand the rental system became critical. Mr. Shoen investigated various avenues through which to obtain the needed financing. The possibility of issuing stock to the general public was quickly rejected once it was determined that the few brokers who were interested would demand up to 40 percent of the proceeds from stock sales as an underwriting commission. Similarly, bank borrowings proved wholly inade-

---

[1]In the interest of simplicity, we will hereinafter refer to the corporation as "U-Haul."

quate. Having failed to obtain more conventional financing, Mr. Shoen and his corporation formulated a plan whereby trailers manufactured by companies owned by the Shoen family would be "sold" to investors, who in turn would immediately place the trailers in the then-emerging U-Haul nationwide rental system.[2] In exchange for placing the purchased trailers in the system, the plan envisioned that fleet owners would receive a percentage of the gross rentals, less operating expenses attributable to the public rentals of their trailers.

The first fleet of trailers was sold to the public in 1952. The operation of each fleet owner's trailer in the U-Haul system was governed by a fleet owner contract. In early 1953, the corporation sought to institute a program of public solicitation to attract more investors willing to purchase trailer fleets, and by September 1953, the Securities and Exchange Commission approved the registration of a public offering of U-Haul trailers. In promoting the sale of U-Haul trailers to the public, the transaction, whereby the investor would purchase trailers and then place them in the U-Haul rental system pursuant to the execution of a fleet owner contract, was represented to the public, the Securities and Exchange Commission, and the States as a sale and leaseback arrangement.

The trailer fleet owner contracts issued during the fiscal year ended March 31, 1973, largely reflected the same basic provisions as were incorporated in the original fleet owner contracts executed in 1952, although a series of modifications were made to the standard form contract during the intervening years. The modifications were designed to limit the risk of loss on the part of the fleet owners. The contracts issued during the year in question were entitled, "Fleet Owner Contract—Rental Trailers." Selected portions of the fleet owner contract issued to trailer fleet owners during the period April 1972 through July 1972, follow:

WHEREAS, the Owner desires to place said trailers into the SYSTEM for the purpose of making said trailers available for rental to the general public on a local (round trip) and/or one-way basis in the SYSTEM; and

WHEREAS, the OWNER desires to share in the money derived from the rental of said trailers in the SYSTEM:

---

[2] The terms "sold," "purchased," "leased," "owner," "lessee," "lessor," and "rent" as used in the findings of fact are not intended to be dispositive of the issue under consideration.

Now, THEREFORE, it is Mutually Agreed Between the Parties Hereto as Follows:

1. That the Owner shall permit said trailers to be operated in the SYSTEM and to be rented to the general public under terms and conditions prescribed by the SYSTEM.

2. That upon receipt of written protests from the owners of twenty percent (20%) of the trailers in the SYSTEM regarding the advisability or fairness of the aforementioned terms and conditions, [U-Haul][3] shall call a meeting of all OWNERS * * *; and that any terms or conditions recommended by the OWNERS of a majority of the trailers in the SYSTEM after a free discussion of the problems involved shall be deemed for the purpose of this agreement, the terms and conditions prescribed by the SYSTEM.

-* * * * * * *

4. That [U-Haul], during the life of this agreement, cannot assign, sell or otherwise encumber the same, and that [U-Haul] warrants and agrees to act as the owner's agent to protect the interests of the OWNER from all converters.

5. That the OWNER shall have the right to sell, transfer and assign its ownership in the aforementioned trailers and its rights under this agreement, subject to [U-Haul's] rights herein.

* * * * * * *

9. That the OWNER, * * * after identifying himself and requesting permission of the Rental Dealer in charge, be permitted to enter the premises on which said trailers are being stored or displayed for the purpose of determining whether or not said Rental Dealer is reporting to [U-Haul] all the income derived from the rental of said trailers, and for the purpose of determining whether or not said trailers are being given a fair and equal opportunity to be selected by the public for use.

* * * * * * *

11. That the OWNER may influence potential trailer rental customers met or contacted by the OWNER off the premises of the Rental Dealers of the SYSTEM, and who are friends or acquaintances of the OWNER to request or select a trailer bearing the OWNER's serial number.

12. That the following definitions or constructions are to be used in interpreting this agreement:

A. The term "gross rental fee" * * * shall be construed to mean the total fee paid by the customer who actually rents and uses a trailer in the SYSTEM.

B. The term "gross rental income" * * * shall be construed to mean the aggregate gross rental fees, paid to Rental Dealers and reported to [U-Haul]

---

[3]The agreement refers to U-Haul as "Advanced Management Engineering & Research Co." or "Advanced." In order to avoid confusion we have substituted the corporation's present name, U-Haul, whenever the corporation is referred to in the agreement.

for the use of the trailers involved in this agreement; provided, however, that the term "gross rental income" shall not be construed to include any gross rental fees not reported and paid to [U-Haul] by Rental Dealers, nor shall it be construed to include any portion of the gross rental fees designated as "R & R Fees," * * *

13. That a portion of the "gross rental fee" collected from part or all trailer customers may be designated as:

A. "Reserve and Redistribution (R & R) Fee." R & R Fees shall be set aside as a trust fund to be administered by [U-Haul] and used to pay the following expenses in the order listed below:

(1) Repair or replacement* costs where a trailer is damaged in an accident** or fire;

(2) Costs incident to accidents** such as towing and storage;

(3) Cost of emergency road service;

(4) Cost of replacing stolen tires, tubes, wheels and trailers;

(5) Repair or replacement* of trailers up to $5,000.00 in event of natural disaster such as fire or flood whereby a number of trailers are damaged or destroyed;

(6) Cargo Insurance on customers' goods;

(7) Cost of redistributing trailers when not paid by the "Surcharge Fee" fund;

(8) Cost of hauling trailers which need repair and repainting to and from repair shops;

(9) Cost of repair and replacement of tires and tubes;

(10) Supply expenses, such as bumper hitches, coupler balls and other minor parts or items necessary or beneficial to the operation of said trailers in the SYSTEM.

*The value of the trailer or trailers at the time of the loss or damage is paid to the Owner.

**Upset, overturn, fire and collision with another vehicle while trailer is being towed on a public road.

\* \* \* \* \* \* \*

That an accounting will be rendered to all Fleet Owners by [U-Haul] as of March 31st of each year showing income and disbursements from the funds together with the balance on hand. Should the balance on hand at the end of such period exceed current obligations of a fund plus a reasonable reserve per trailer, such excess will be deemed surplus and will be distributed, with all Fleet Owners receiving their standard thirty-five (35%) percent according to the income enjoyed by each during the period the surplus accumulated. In the event of inadequacy or discontinuance of collection of these "Fees" from trailer users, Fleet Owner expenses paid by these fees shall be borne by the OWNER.

\* \* \* \* \* \* \*

16. That, subject to the terms of paragraphs 13 * * *, the OWNER consents to the deduction by [U-Haul] from the OWNER's gross rental

income, all monies expended by [U-Haul] and/or other members of the U-Haul Rental System for the following items, hereinafter referred to as "trailer operation expenses."

A. License fees or charges levied, imposed or charged by any Federal, State or Municipal legally constituted authority for the purpose of permitting said trailers to operate on the highways under the jurisdiction of said authority.

B. Public Liability and Property Damage Insurance necessary or advisable to the operation of said trailers in the SYSTEM.

C. Maintenance and repair expenses necessary to maintain said trailers in condition to satisfactorily, safely and competitively operate in the SYSTEM, including the cost of hauling trailers to and from repair shops.

D. Supply expenses such as bumper hitches, tarpaulins, coupler balls and other items necessary or beneficial to the operation of said trailers in the SYSTEM.

E. The repair and replacement of tires and tubes on said trailers.

F. Fire, theft, flood, wind, conversion, and trespass losses, and losses incurred by abandonment, vandalism and acts of God.

OWNER directs that all trailer operation expenses shall be done under the supervision of [U-Haul], and OWNER hereby divests himself of all control over the manner, type, place, amount, or nature of performing said trailer operation expenses.

18. That the OWNER's share of the gross rental income received from the rental of said trailers in the SYSTEM shall be thirty-five percent (35%) of their gross rental income as defined in Section 12(b).

19. A. That [U-Haul] covenants and agrees to deliver or send by mail to the OWNER on approximately the twentieth day of March, June, September and December of each year the following reports on the operation of said trailers during the preceding three-month period.

(1) A true and accurate statement of the gross rental income earned by said trailers.

(2) A true and accurate statement of the trailer operation expenses chargeable to said trailers for said three-month period.

B. That [U-Haul] further covenants and agrees that, at the time of delivery or mailing to the OWNER of each of such statements, it will pay to the OWNER, from the * * * special bank account, all amounts due on the OWNER's said percentage of said gross rental income of said three-month period after said trailer operating expenses have been subtracted therefrom.

C. That [U-Haul] further covenants and agrees to maintain accurate accounting records of the income and expenses of said trailers consistent with generally accepted accounting principles.

* * * * * * *

21. That [U-Haul] shall reasonably arrange for the recovery of any of said trailers which may be lost, stolen, converted, or abandoned.

* * * * * * *

23. That [U-Haul] procure, order and cause to be done any and all of the other items hereinbefore enumerated as trailer operation expenses deemed necessary or beneficial to the operation of said trailers in the SYSTEM.

* * * * * * *

25. That [U-Haul] shall promote the welfare of the OWNER relative to the SYSTEM in every reasonable manner.

26. That [U-Haul] shall keep, save and hold harmless the OWNER from any and all damages and liability for anything and everything whatsoever arising from the operation of said trailers in the SYSTEM, save and except the aforementioned expenses herein set out as chargeable to the OWNER.

27. That [U-Haul] shall pay or provide for and cause to be paid all other expenses, taxes and services necessary to the operation of said trailers in the SYSTEM.

* * * * * * *

31. That the OWNER shall at no time be personally liable to [U-Haul] for payment of the operation expenses set out in Section 16 of this contract should they exceed the OWNER's share of the gross rental income for any three-month period, save and except these expenses may be debited to the OWNER and deducted from future earnings of said trailers with payment thereof secured by a lien on each and every one of said trailers.

32. That said trailers are to remain in the SYSTEM for a minimum period of six years from the date of their manufacture and for such time thereafter as [U-Haul] * * * shall reasonably deem each trailer of this group of trailers to be fit to safely operate in the SYSTEM, save and except,

A. The OWNER may deem unfit at any time any trailer whose operation expenses, as set out in Section 16, exceed or appear likely to exceed the OWNER's share of its future gross rental income.

B. [U-Haul] * * * may declare the entire fleet unfit at any time should the OWNER's share of the gross rental income from said trailers fail to equal the aforementioned operation expenses of said trailers for a period of three months or more save and except the OWNER may at his option pay such sums to make up the deficiencies as they accrue and thereby stay [U-Haul's] power to declare the trailers unfit for this reason.

33. In the event a trailer is deemed unfit * * * [U-Haul], in its discretion, shall either:

A. Cause the trailer to be repaired in such a manner as will result in the trailer being fit to safely and competitively operate in the trailer rental market, or

B. Cause the trailer to be sold for private use and the proceeds of such sale credited to OWNER less any direct costs of such sale, or

C. Cause the trailer to be scrapped and completely removed from the trailer rental industry, and the net salvage value, if any, credited to OWNER.

The standard fleet owner contract covering trailers was modified on two occasions during petitioner's fiscal year ended March 31, 1973.[4] However, the provisions incorporated in the modified contracts were substantially similar to the above-quoted provisions, and the relatively minor changes are insignificant for our purposes.

In addition to promoting the sale of trailer fleets, U-Haul also promoted the sale of truck fleets and the sale of specialty rental equipment (handtrucks and towbars). Whereas trailer fleets were either independently owned by members of the general public or company-owned by various subsidiaries of Amerco, truck fleets were owned by U-Haul rental companies, Amerco Lease Co., or a trust composed of U-Haul employees. The specialty rental equipment was sold to trailer fleet owners.

Sales of truck fleets were made in conjunction with the execution of standard fleet owner contracts covering the trucks. The provisions contained in the standard contract for trucks used during petitioner's 1973 fiscal year were substantially similar to the above-quoted provisions contained in petitioner's standard contract for trailers. Differences in those contracts included the following: (1) the R & R fee referred to in the above-quoted provision 13 covered some additional operating expenses. The owner was not personally liable for the payment of the operating expenses, except that payment of any excess of such expenses over the owner's share of the gross rental income and the owner's proportionate share of the R & R fees were to be secured by a lien on the owner's vehicles. (2) The owner's share of gross rental income was 45 percent. (3) Whenever a vehicle was deemed unfit, U-Haul International would arrange for the vehicle to be sold at the best available price and would pay the owner the proceeds of such sale, less any direct selling expenses.

Sales of specialty rental equipment were made in conjunction with the execution of a standard, supplemental fleet owner contract for specialty rental equipment, to be attached to and to incorporate all of the terms of a trailer fleet owner contract with certain specific modifications.

---

[4] One modified contract was issued during the months of August 1972 through December 1972. The second modified contract was issued during the months of January 1973 through March 1973.

The U-Haul rental system as it functioned during the fiscal year ended March 31, 1973, was made up of five primary components, each with its own unique contribution to the system: manufacturing companies, fleet owners, U-Haul, rental companies, and rental dealers. The system was bound together by a series of contracts, running from one component of the system to another.

The manufacturing companies, which were wholly owned subsidiaries of Amerco during the 1973 fiscal year, manufactured and repaired U-Haul trailers, trucks, and specialty equipment for use in the U-Haul system. All equipment manufactured by these companies contained detailed markings identifying the equipment as part of the U-Haul system and also contained a number to enable U-Haul to ascertain from its records the identity of the owner of the equipment.[5]

The fleet owners were those persons who owned equipment operating in the U-Haul system. "Independent fleets" were owned by individuals, partnerships, and unrelated corporations, while "company fleets" were owned by subsidiaries of Amerco, primarily U-Haul rental companies. All independent and company fleet owners were required to execute a fleet owner contract with U-Haul. Once the fleet owner executed a fleet owner contract, the equipment subject to the contract was then transported from the manufacturing company directly to a U-Haul rental company doing business in the area of the country where the manufacturing company was located.

U-Haul was essentially the entity through which the fleet owners gained access to the rental system. Throughout the history of the rental program, U-Haul (or its predecessor in name) provided an array of services to all components of the system. During the 1973 fiscal year, U-Haul was composed of 11 operating departments with a total of 931 employees (approximately one-fourth of the total employees of Amerco and its subsidiaries). U-Haul's accounting department received

---

[5]The outside of the trailers and trucks bore the name "U-Haul," the trademark and symbol of a wheel with the name "Amerco" printed below, and a number identifying the fleet owner, the model of the equipment, and the serial number of the equipment. The trailers bore the phrases "Adventure in Moving" and "Rent-One-Way Anywhere," while the trucks bore the phrase "One-Way and Local Rentals." The tires and hubcaps were branded with the name "U-Haul." In addition, the trucks were branded with the initials "UH" inside the hood and on the engine block. These brandings were an antitheft device used to enable personnel of Amerco subsidiaries to detect U-Haul equipment that had been painted over or sanded down. The equipment did not bear the fleet owner's name.

proceeds from the rental of U-Haul equipment, and divided them among the fleet owners, rental companies, rental dealers, and U-Haul. The finance department was responsible for securing financing from the banks for all of the Amerco companies. The legal department was responsible for performing various legal functions, which included dealing with the Securities and Exchange Commission, drafting agreements, and providing advice to the field operations in the U-Haul system. The personnel department was responsible for advising the field relative to hiring and firing practices and recommending various pay scales to be used in different parts of the country. The real estate department was responsible for locating, negotiating, and purchasing properties needed for field operations of the U-Haul system throughout the United States. The communications department was responsible for drafting, printing, and mailing the various bulletins and manuals sent to the field in connection with the operation of the U-Haul system. The area field offices were essentially small accounting departments located at the headquarters of various U-Haul rental companies, and which provided these companies with accounting, bill collection, and traffic-control services.

The marketing department set rental rates, controlled the distribution of the U-Haul equipment operating in the system, established distribution fees added to one-way rental rates to ensure an adequate distribution of the equipment throughout the country, and published bulletins setting forth the manner in which certain marketing programs were to be carried out. The technical center employed engineering, testing, and repair personnel who designed, modified, tested, and determined production plans for all U-Haul equipment operating in the system. A test track located at the technical center was used to test equipment prior to placement in the system. The corporate development department was responsible for investigating other business opportunities for Amerco and its subsidiaries. In addition to the above-enumerated services, U-Haul performed any function that the day-to-day operations of the system required from legislative lobbying to litigation proceedings involving the various U-Haul companies.

The U-Haul rental companies operated in the various States and delivered fleet owner equipment to rental dealers located

in the rental companies' respective regions. During the fiscal year at issue, there were over 90 rental companies operating in the system. An agreement between each rental company and U-Haul, designated "U-Haul Rental Company Contract," provided that each rental company was responsible for the merchandising, marketing, maintenance, and supervision of repair and manufacture of the U-Haul equipment in its territory. In performing these functions, the rental companies were bound to follow the principles, programs, and procedures set out in the bulletins periodically published by U-Haul. The contract set forth in detail the various obligations of the rental companies, such as the establishment of sufficient rental dealers to rent effectively U-Haul rental equipment, the periodic inspection and orientation of rental dealerships, the execution of U-Haul dealership contracts with all rental dealers, the periodic auditing of rental dealerships, the procuring of advertising, and a number of other specific duties. The rental companies agreed to hold U-Haul and the fleet owners harmless from any and all damages or liability arising from the operation of any U-Haul equipment, or arising from the negligence of personnel of the rental companies or rental dealerships. In return for the services rendered by the rental companies, U-Haul agreed to perform various services for the rental companies. In addition, the rental companies were entitled to receive a specified percentage of gross income from the rental of U-Haul equipment in their respective territories.

The last link in the rental system was composed of the rental dealerships which made the U-Haul equipment available to the public for rental. The dealerships were established by the rental companies in their respective territories. These rental dealerships were not companies owned by L. S. Shoen, Amerco, or any of Amerco's subsidiaries. Generally, they were independent service station operators. A U-Haul dealership contract was executed between the U-Haul rental company and each rental dealer in its territory, appointing the latter to act as an agent to the former for the rental of U-Haul equipment. The rental dealer agreed to promote effectively the rental of U-Haul equipment, to comply with all programs, procedures, and standards prescribed by the rental company, to collect user fees prior to dispatching equipment, to perform safety inspections on rental equipment, to mail to U-Haul an

accurate report of the dealer's weekly rental transactions, and to perform various other duties of a similar nature. The rental companies agreed to hold the dealers harmless from any and all liability for property damage or personal injury to third parties arising out of accidents involving U-Haul equipment; to indemnify, hold harmless, and defend the dealer against any claims, actions, or suits arising in connection with the renting of U-Haul equipment to the public; to assume all responsibility for loss due to theft; and to pay the dealer specified commissions based on a percentage of rental income reported.

Each rental customer was required to execute a rental contract and to pay the dealer the specified rental fee, including any additional fee for insurance. Pursuant to such rental contract, the customer was liable for all damages and liabilities arising out of the rental of the equipment, including damages to the equipment and personal property transported in the equipment.[6] The trailer serial number and other pertinent information were written on the rental contract. The rental dealers mailed the contracts and the rental fees to U-Haul once a week. On receipt of the rental fees, U-Haul deposited the money in a non-interest-bearing special bank account. A portion of the gross rental fees was transferred into the Reserve and Redistribution Fund, a special fund administered by U-Haul and used to pay certain specific expenses set out in the fleet owner contracts. Fleet owners received a periodic report showing the gross rental income earned by all trailers in the fleet and the trailer operation expenses properly chargeable to the trailers. A bank check for the excess of such income over such expenses accompanied the report. U-Haul was also responsible for disbursing gross rental income among the other components of the system. The following chart illustrates how the trailer rental fees (after the deduction of a portion thereof allocated to the Reserve and Redistribution Fund) were shared by the primary divisions of the rental system:

---

[6]The customer could avoid liability for damage to the equipment and cargo by electing optional insurance coverage.

| | Dealer | Fleet owner | Rental company | U-Haul |
|---|---|---|---|---|
| Round-trip rental | 30 – 40% | 35% | 10 – 20% | 15% |
| One-way rental | 20 – 25 | 35 | 25 – 30 | [7]15 |

For corporate bookkeeping purposes, U-Haul did not report the total gross rental fees received from rental dealers. It reported only its share of the gross rental income, without deducting as expenses the amounts distributed to those components of the system entitled to a percentage of the rental income.

With this rather elaborate background in mind, we turn to the facts surrounding the tax year in suit.

During the fiscal year ended March 31, 1973, 37 fleets of U-Haul equipment were sold pursuant to fleet owner contracts for a total purchase price of $5,311,656.40. Twenty-two of the fleets were sold to individuals, some of whom were employees of Amerco and its subsidiaries, while 15 fleets were sold to Amerco Trust Fleet No. 72, a trust composed of eligible employees of Amerco and its subsidiaries. All of the individual fleets were composed of more than one person, thereby creating fractional ownership interests in the fleet. The 22 fleets sold to individuals consisted of trailers and were composed of 513 separate individuals who invested a total of $2,201,127. The 15 fleets sold to Amerco Trust Fleet No. 72 consisted of trailers, trucks, towbars, and handtrucks at a total cost of $3,110,529.40. The trailers and trucks were tangible personal property with useful lives of 7 years or more. The towbars and handtrucks were tangible personal property with useful lives of between 3 and 5 years.

Amerco Trust Fleet No. 72 was an integral part of a bonus program for employees of Amerco and its subsidiaries who were eligible for bonuses during the 1973 fiscal year. Under the bonus arrangement, 50 percent of the gross amount of an employee's bonus was contributed directly to the trust, and the remaining 50 percent was paid to the employee in cash, less withholding taxes. The trustee, Arcoa International, Inc., paid this money directly to U-Haul and executed fleet owner contracts. The trust was additionally funded by a loan received from the U.S. National Bank of Oregon. All proceeds derived

---

[7]The division of the rental income received from the rental of trucks varied slightly from the division of the rental income received from the rental of trailers.

from the trust fleets during the first 5 years of operation were used to pay the bank loan. At the end of 5 years, the trust was terminated and the equipment was transferred to the remaining employee-beneficiaries. Any employee who left the employ of Amerco or its subsidiaries at any time prior to the expiration of the 5–year period was paid in cash the amount of his or her bonus originally contributed to the trust.

Of the investors who purchased interests in the 37 fleets during the 1973 fiscal year, all but 8 individuals signed an "Investment Incentive Tax Credit Lessors Election Statement," electing as lessors of the equipment to pass the investment tax credit on such equipment to U-Haul as lessee of the equipment. There is no evidence to suggest that the 505 individuals who executed election statements for that year claimed the investment tax credit for such equipment on their Federal income tax returns. Amerco Trust Fleet No. 72 also executed an election to pass the investment tax credit through to U-Haul. The investment tax credit, covered by these elections, totaled $319,839.03. The credit was taken on the consolidated tax return filed by Amerco for its 1973 fiscal year. Respondent determined that the relationship of the fleet owners to U-Haul was not that of lessor-lessee and disallowed the $319,839.03 investment tax credit covered by the election statements.

OPINION

Section 48(d)(1), I.R.C. 1954, generally provides that a person who is a lessor of property may elect with respect to new section 38 property to treat the lessee as having acquired such property for purposes of the investment tax credit allowed by section 38. The lessee is treated as having acquired the property for an amount equal to its fair market value, or, if the property is leased by a corporation that is a component member of a controlled group, to another corporation that is a member of the same controlled group, the basis of the property to the lessor. Sec. 48(d)(1)(A) and (B).

Section 1.48–4(f)–(h), Income Tax Regs., sets forth the procedural requirements for electing to pass the investment tax credit to the lessee of the property.

The parties agree that the property in question constituted new section 38 property and that the procedural election

requirements were satisfied. Further, there is no dispute with respect to the fair market value of the property. The contested issue relates to whether the arrangement between the fleet owners and U-Haul established a lessor-lessee relationship or an agency relationship. Respondent contends that the agreement established an agency relationship and that, therefore, U-Haul is not entitled to claim the investment tax credit as lessee of the property. Petitioner, on the other hand, contends that the agreement established a lessor-lessee relationship and that, therefore, under section 48(d)(1), U-Haul is entitled to claim the credit as lessee of the property. In the event the Court fails to find that the fleet owner contracts constituted leases, petitioner urges the Court to find that U-Haul is entitled to the investment tax credit as the true owner of the property, either because the contracts constituted conditional sales agreements or because the entire arrangement was merely a financing device.[8]

We have considered all possible characterizations of the relationship suggested by the parties, and we note at the outset our agreement with respondent that the fleet owner contracts did not constitute conditional sales contracts, and that the entire transaction was not a mere financing device.[9]

With respect to petitioner's alternative contention that the fleet owner contract was a conditional sales contract, we recognize that the equipment was specially designed for use in the U-Haul system, that the value of the equipment was essentially exhausted at the end of the "lease term," and that there was never any possibility that U-Haul would physically return the equipment to the fleet owners. Such factors may be indicative of a sales contract. However, on an overall analysis, we do not believe that the legal rights and duties of the parties to the contract were similar to those existing under a sales contract. Nor were the "rental payments" set with a view to the recovery of the purchase price plus interest. Rather, they were based on the use of the property.

---

[8]Petitioner acknowledges that, if the Court accepts its alternative argument that the entire arrangement constituted a mere financing device, the profit margin earned by U-Haul manufacturing companies must be eliminated for basis purposes, thereby reducing the investment tax credit available to U-Haul. See secs. 1.1502–3(a)(2) and 1.1502–13(a)(1), Income Tax Regs.

[9]Neither party argues that the fleet owners and U-Haul were engaged in a joint venture or partnership, and we have not considered the issue.

With respect to petitioner's alternative contention that the entire arrangement constituted a mere financing device, we readily agree that the purpose of the fleet owner concept was to procure a source of financing for equipment used in the U-Haul system. However, we also believe, with respondent, that the fleet owners were more than mere creditors. The fleet owners made a real economic investment in the equipment and enjoyed a significant economic return on that investment. This is not a case where "rentals" were fixed in terms of amounts necessary to amortize indebtedness over a number of years or where the burdens and benefits of the property rested almost exclusively with a "seller-lessee." Nor is this a case where there were no business purposes aside from taxes for the sale and leaseback form of the transaction. The fleet owners were always represented as exactly that, owners, and there is no basis in this case to justify a decision that U-Haul was the true owner of the property. Accordingly, we view the issue of whether U-Haul is entitled to claim the investment tax credit as turning on the issue of whether the agreement between the fleet owners and U-Haul was a lease or a management contract.

In determining whether a contract establishes an agency arrangement or a lessor-lessee arrangement, the substance of the underlying transaction, and not the form of the contract, itself, controls its interpretation for tax purposes. We must consider all of the facts and surrounding circumstances in order to determine the intent of the parties as revealed in their actions and statements and the overall economic realities of the transaction. *Kingsbury v. Commissioner,* 65 T.C. 1068, 1085 (1976); *University Hill Foundation v. Commissioner,* 51 T.C. 548, 568 (1969), revd. and remanded on other grounds 446 F.2d 701 (9th Cir. 1971), cert. denied 405 U.S. 965 (1972).

This Court has recognized, as have other courts, that two key factors indicate the existence of an agency arrangement: (1) Control over the venture by the property owner, and (2) risk of loss on the property owner. *State National Bank of El Paso v. United States,* 509 F.2d 832 (5th Cir. 1975); *Kingsbury v. Commissioner, supra; Meagher v. Commissioner,* T.C. Memo. 1977–270; *McNabb v. United States,* an unreported case (W.D. Wash. 1980, 47 AFTR 2d 81–513, 81–1 USTC par. 9143).

The contractual relationship between the fleet owners and U-Haul is similar in many respects to the contractual relationships examined in both the *Meagher* and *McNabb* cases, *supra,* both of which are extensively treated by the parties. In the former case, we characterized the contractual relationship at issue as an agency arrangement. In the latter case, the District Court distinguished *Meagher* and characterized the contractual relationship in *McNabb* as a lessor-lessee relationship. Petitioner urges that the instant case is factually closer to *McNabb*; whereas respondent, naturally, urges that the instant case is factually closer to *Meagher.*

In *Meagher*, the taxpayers purchased a railroad tank car in 1971 and entered into an agreement with Relco Tank Lines, Inc. (Relco), entitled "Relco Tank Line, Inc. Management Contract," with respect to such tank car. Under the Relco agreement, Relco agreed to use its best efforts to arrange for the leasing of the tank car to shippers, railroads, or others, to place reporting marks on the car, and to perform all managerial and administrative functions necessary to the operation of the car, including collecting the mileage or per diem earnings, repairing and maintaining the car, and keeping adequate records of its operations. In return, the taxpayers agreed to pay Relco a quarterly management fee equivalent to 35 percent of the gross operating profit generated by the tank car. Gross operating profit was defined as income generated from the operation of the tank car, less costs and expenses incurred for its operation. The taxpayers agreed to defend, indemnify, and hold Relco harmless from and against any and all loss, damage, or liability. Relco would obtain insurance coverage naming the taxpayers as co-beneficiaries and insuring them against these risks and liabilities. Further, Relco was given the authority to maintain a cash reserve for expenses to be deducted from net earnings payable to the taxpayers and other owners of tank cars, not to exceed $200 per car. The taxpayers agreed to reimburse Relco for the amount of any expenses incurred by the taxpayers' car in excess of the amount set aside in the reserve therefor. The contract had a minimum term of 10 years and was thereafter terminable at the will of either party.

The taxpayers claimed the investment tax credit with respect to their tank car on their 1971 Federal income tax

return. The Commissioner disallowed the credit on the theory that the agreement between Relco and the taxpayers constituted a lease rather than a management contract, and that the taxpayers, as noncorporate lessors, failed to qualify for the credit under what is now section 46(e)(3).[10]

We disagreed with the Commissioner, concluding that the agreement constituted a management contract, and held that the taxpayers were entitled to the credit as owners of the property. We noted that, while the taxpayers did not directly control the leasing activities of Relco in that leases with third parties were left to Relco's discretion, the taxpayers did exercise a degree of control over the venture at the outset by including certain provisions in the agreement that controlled Relco's participation. Such provisions required Relco to keep adequate records of the tank car's operation, to use its best efforts to arrange for leasing of the taxpayers' tank car, to obtain insurance coverage for the tank car naming the taxpayers as co-beneficiaries, and periodically to pay net earnings of the tank car to the taxpayers except that Relco was authorized to maintain a $200 reserve for expenses. We further noted that the risk of loss rested squarely on the taxpayers' shoulders. Under the Relco agreement, the taxpayers agreed to reimburse Relco for the amount of any expenses incurred by the tank car in excess of the $200 reserve and to defend, indemnify, and hold Relco harmless from and against all risk of loss or damage to their tank car as well as all claims, damages, expenses, or liabilities incurred by, or asserted against it, as a result of the operation, possession, control, or use of their tank car. Finally, we stated that if the agreement "were held to be a lease it would be a strange one, for the 'lessee' would be required to pay 'rent' only if its use of the property resulted in net profit." In short, the taxpayers assumed the risks of a normal business transaction, not mere

---

[10]Sec. 46(e)(3) provides, in part, as follows:

(3) NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—
 (A) the property subject to the lease has been manufactured or produced by the lessor, or
 (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

passive investment or financing risks. Accordingly, the agreement was more properly characterized as a management contract.

At first glance, one might think that our analysis and ultimate decision in *Meagher* would compel a decision in respondent's favor in the instant case. As in *Meagher*, the agreement between the fleet owners and U-Haul limits U-Haul's participation. For example, U-Haul is required to keep adequate records of the equipment's operation, to promote the welfare of the owner in every reasonable manner, and periodically to pay to the owner gross rental income (less certain expenses). However, the inquiry is inherently factual, and differences in the rights and duties of the parties may tip the scale in the opposite direction. *McNabb v. United States, supra,* is illustrative.

*McNabb* involved an agreement between the taxpayers and AFCO Furniture Rentals, Inc. (AFCO), whereby AFCO was to purchase furniture for the taxpayers and to place it in a pool of furniture, which AFCO would then rent to the public on behalf of all of the furniture owners.[11] The Commissioner took the position that the agreement constituted a lease and that the taxpayers, as noncorporate lessors, were not entitled to claim the investment tax credit because they failed to meet the requirements of section 46(e)(3). The District Court viewed the ultimate issue as turning on the question of whether the agreement between the taxpayers and AFCO was a lease or a management contract, and proceeded to apply the control and risk of loss tests discussed in *Meagher.*

The court found that the taxpayers had virtually no control over the furniture-leasing activities of AFCO. The express terms of the agreement stated that AFCO had "full control of all furniture in the rental pool" and the "sole and exclusive authority to set rental rates." The only control that the taxpayers retained under the agreement was the ability to withdraw from the pool upon 30 days' notice. Although the agreement did provide for periodic reports to the taxpayer regarding operations, annual financial reports, and notice prior to use of any amended rental forms, it did not give the

---

[11]The case itself does not make it clear that the furniture owner purchased the furniture directly from AFCO. We have taken this fact from our own examination of the "Furniture Owner Contract," stipulated into evidence by petitioner and respondent herein.

taxpayers any means by which they could use the information to alter the operation of the rental pool. With respect to risk of loss, AFCO was responsible for all overhead and operating expenses, with the exception of personal property taxes, maintaining the furniture, and replacing destroyed or damaged furniture during the first 3 years after its acquisition. AFCO had no recourse against the taxpayers in the event that operating expenses exceeded AFCO's 65-percent share of the gross rentals. In addition, the agreement specifically provided that AFCO would indemnify and hold harmless the taxpayers from any and all damages and liabilities arising from the rental or leasing of furniture in the rental pool. Hence, under the control and risk-of-loss tests set forth in *Meagher*, the court found that the agreement could not properly be characterized as a management contract.

According to the court, the agreement at issue in *Meagher* was distinguishable from the agreement between the taxpayers and AFCO in that in *Meagher* (1) the taxpayers were responsible for all operating expenses, (2) the taxpayers agreed to hold the managing agent harmless from all loss or damage to the tank car, as well as all claims asserted against the managing agent arising out of its operation of the car, and (3) the managing agent agreed to use its best efforts to arrange for the leasing of the car. Additional factors present in *McNabb* persuaded the court to opt for a lease categorization: (1) The AFCO agreement did not contain a "best efforts" clause; (2) AFCO was within certain limits free to use the taxpayers' furniture as it saw fit; and (3) the taxpayers were free to sell their furniture and thereby assign their interest in the rental pool. The fact that the agreement provided for a variable rent dependent upon AFCO's ability to lease the furniture in the pool, as opposed to the more common fixed rent, did not prevent the agreement from being a lease. Accordingly, since the court concluded that the agreement was a lease of furniture from the taxpayers to AFCO, the court held that the taxpayers were precluded from claiming an investment tax credit by virtue of their failure to satisfy the requirements of section 46(e)(3).

While the arrangement between the fleet owners and U-Haul possesses obvious similarities to the arrangements considered in both the *Meagher* and *McNabb* cases, the subject

arrangement is sui generis, and neither of the decided cases tells us that it is clearly a lease, on the one hand, or clearly an agency arrangement, on the other. Our analysis of the facts yields some indicia of a lessor-lessee relationship and some indicia of an agency relationship. Hence, the issue at first blush is a close one. However, after carefully weighing all the evidence in the record, most of our initial doubts and concerns are dispelled and we are comfortable in holding that the fleet owner contracts are leases.

With respect to the control test, we are not persuaded that the fleet owners retained sufficient control over the U-Haul rental system to warrant the finding of an agency arrangement. Initially, we note that U-Haul always used a standard fleet owner form contract to set the terms and conditions of ownership. U-Haul did not vary those terms and conditions to satisfy the demands of any potential fleet owner. In other words, potential fleet owners had two choices—they could either agree to the terms and conditions imposed by U-Haul, or they could refrain from purchasing an interest in a fleet. Furthermore, U-Haul retained control over the day-to-day operations of the system. The terms and conditions of trailer rentals to the public were set, or at least recommended, by U-Haul. In addition, the agreements expressly provided that all trailer operation expenses were to be made under the control and supervision of U-Haul, and that fleet owners divested themselves of "all control over the manner, type, place, amount, or nature of performing said trailer operation expenses."

We do not believe that the evidence, when taken as a whole, supports respondent's position that U-Haul's role in the rental system was limited to accounting and advisory functions. Although U-Haul delegated substantial responsibilities to the rental companies, we are convinced that U-Haul retained ultimate control over the system and indeed functioned, in petitioner's words, as its "backbone." It is true that the fleet owners had the right to enter the premises on which their vehicles were being displayed, for purposes of determining whether the dealer was accurately reporting rental income and properly displaying the equipment, and had the right to influence friends and acquaintances, contacted off the premises, to rent their equipment. As a practical matter, however,

these rights were illusory since the owners could not designate the locations where their vehicles would be displayed, nor were they ever so informed. The fact that the agreements provided a control or check by the fleet owners over U-Haul by imposing an obligation on U-Haul to promote the welfare of the fleet owners, an obligation to exercise diligent efforts to ensure the proper reporting of all gross rental fees received by dealers, and an obligation to send periodic accountings to fleet owners of the income and expenses attributable to their equipment did not give fleet owners control over U-Haul's operations as such. Such obligations on U-Haul's part were theoretically necessary to protect the fleet owners in their positions as lessor-owners of the property and were consistent with the percentage lease concept. Cf. *Grandview Mines v. Commissioner*, 282 F.2d 700 (9th Cir. 1960), affg. 32 T.C. 759 (1959).[12]

In support of his position that ultimate control over the operations of the rental system rested with the fleet owners, respondent places heavy emphasis on clause 2 of the contracts. Under that clause, in the event U-Haul received written protests from owners of 20 percent of the vehicles in the system, U-Haul was required to call a meeting of all owners, and the owners of 50 percent of the vehicles were then empowered to alter the terms and conditions of public rentals. Although we may agree with respondent that this provision, taken literally, extended a valuable right to fleet owners, we decline to assign any practical significance to it. As a realistic matter, any exercise of this right to alter the actual operations of the system is highly unlikely. History appears to bear us out in this regard, as the provision has never been invoked, notwithstanding its presence in every fleet owner contract issued since 1952.

The risk-of-loss test is somewhat more troublesome than the control test. We cannot agree with petitioner that the fleet owners had no risk of loss whatsoever. At the same time, it is clear to us that, over the years, measures were taken to limit substantially the risk that did exist. These measures effective-

---

[12]We recognize that in *Meagher v. Commissioner*, T.C. Memo. 1977–270, we considered similar obligations imposed on Relco as evidence of the taxpayers' control over Relco. However, the decision in *Meagher* was based on a consideration of the totality of the facts, as the instant case must be.

ly resulted in a sharing of the burden of losses and expenses among the various participants in the system.

In 1954, U-Haul inserted a provision in the standard fleet owner contract for trailers, limiting the fleet owners' liability for operating expenses to the extent of income earned by the fleet owner from his fleet. This provision remained in the trailer fleet owner contracts in effect during the 1973 fiscal year. Although a fleet owner's liability for operating expenses could not exceed the fleet owner's share of gross rental income, excess operating expenses could be carried over and charged against the fleet owner's share of gross rental income in subsequent years. However, at no time did U-Haul have any recourse against a fleet owner in the event that the fleet owner's earnings were insufficient to absorb these expenses.[13] In other words, a fleet owner could not be required to supplement his original investment in order to pay for normal operating expenses. Thus, with respect to expenses chargeable against a fleet owner's share of gross rental income, the fleet owner's liability for expenses was limited to his earnings from the venture.

Beginning in 1957 and continuing through the fiscal year ended March 31, 1973, U-Haul deducted a portion of the gross rental fees collected from public rentals and set it aside in a special fund used to pay for losses and expenses arising primarily out of the destruction, theft, or accident of a vehicle. During the 1973 fiscal year, this fund was referred to as the "Reserve and Redistribution Fund" (R & R Fund).[14] The R & R Fund had the effect of leveling out losses and expenses attributable to the vehicles by pooling those losses and expenses and providing for the payment therefor from a common fund. An annual accounting was rendered by U-Haul to the fleet owners, showing income and disbursements from the R & R Fund together with the balance on hand. To the extent that the balance on hand exceeded current obligations of the fund, plus a reasonable reserve per trailer, the excess was distributed to the various participants in the rental system according to their respective percentages in the gross rental income. Since the R & R Fund was funded by a portion of the gross rental fees collected from public rentals, the

---

[13]The relevant clauses are clauses 16 and 31 quoted above.

[14]The relevant clause is clause 13 quoted above.

amounts set aside in the fund proportionately reduced the amounts distributable to the fleet owners, U-Haul, the rental companies, and the rental dealers. Accordingly, the burden of satisfying expenses and losses paid for out of the R & R Fund ultimately rested with each member of the system entitled to a percentage of the gross rental income.

Losses attributable to damages and liability arising out of the operation of U-Haul equipment were not directly satisfied out of an owner's share of gross rental income or out of the R & R Fund. Under the express terms of the fleet owner contracts, U-Haul agreed to hold fleet owners harmless from all damages and liability arising out of the operation of U-Haul rental equipment. U-Haul, in turn, protected itself against such liability in a number of ways. First, U-Haul included a provision in the fleet owner contracts authorizing it to purchase public liability and property damage insurance. In the case of trailer fleet owners, premium payments for the insurance were deductible from each owner's share of gross rental income. In the case of truck fleet owners, premiums were payable out of the R & R Fund. U-Haul further protected itself against risk by incorporating in the rental company contracts a provision requiring the rental companies to hold U-Haul harmless from operational damages and liability. The rental companies were, however, contractually entitled to the benefits of public liability and property damage insurance provided under the fleet owner contracts. U-Haul rental companies protected themselves against liability by seeking to impose the risk on the ultimate consumers under a provision in the rental contracts requiring rental customers to indemnify and hold harmless the lessor and its duly authorized agents from any and all damages or liability resulting from the customer's use of the equipment. In the event they elected and paid for optional insurance coverage, rental customers were released from liability for accidental damage to, or loss through the theft of, U-Haul equipment. While we might agree with respondent that U-Haul fully and completely passed the risk of loss for operational damages and liability to either the rental companies or the ultimate consumers, the relevant question is whether the fleet owners retained the risk of loss for such damages and liability, and we conclude that they did

not.[15]

In summary, with respect to those operational expenses chargeable against a fleet owner's gross rental income, the fleet owner bore the burden of those expenses, but only to the extent of his share of gross rental income. With respect to those expenses and losses payable out of the R & R Fund, all participants in the rental system entitled to a percentage of gross rental income, effectively shared those expenses and losses. With respect to damages and liability arising out of the operation of U-Haul equipment, although a fleet owner's share of earnings might be used to purchase public liability and property damage insurance, a fleet owner did not bear the risk of personal liability for such losses. In essence, a fleet owner was at risk to the extent of his initial investment, and his share of gross rental income was subject to being depleted, either by a direct offset against, or through allocation to, the R & R Fund, by expenses and losses arising in the course of the venture. While the possibility existed that a fleet owner could lose his initial investment, the evidence presented convincingly indicated that no fleet owner had ever lost his initial capital investment. To the contrary, from the inception of the system, fleet owners consistently earned a significant economic return on their investments in U-Haul equipment. In accordance with our findings, we conclude the risk of loss to which fleet owners were subject was well contained and relatively minimal.

Respondent raises a number of additional arguments, in a well-written brief, in support of his position that the fleet owner contracts constituted management contracts. First, respondent correctly points out that the contracts contained language more indicative of an agency contract than of a lease. For example, U-Haul agreed (1) to act as the owner's "agent in the division of the profits"; (2) "to act as the owner's agent to protect the interests of the OWNER from all converters"; and (3) to act as the owner's "true and lawful attorney in fact * * * to ask, demand, sue for, recover and receive all sums of money that may become due and payable to the OWNER in the operation of said trailers in the SYSTEM and to do everything reasonable in the collection of money or damages due to the OWNER because of the loss or damage to said trailers and to

---

[15]We note that evidence presented by petitioner indicates that no independent fleet owner has ever been named in a lawsuit based on a negligence claim against U-Haul.

do all things necessary or desirable to the operation of said trailers in the SYSTEM the same as the OWNER might or could do." Petitioner explains that this verbiage was inserted in the standard fleet owner contracts over the course of a period of years, as each provision was found necessary for the effective operation of the system, to self-impose the responsibility on U-Haul to retake physically stolen equipment, to ensure that U-Haul had standing to bring a lawsuit for the recovery of such stolen equipment, and to permit U-Haul to divide the profits arising from the operation of fleets composed of more than one fleet owner. Certainly, the labels attached by the parties, themselves, may be taken as evidence of the intended relationship of the parties. However, the technical terms of an agreement are not conclusive as to the relationship it creates. The substance of the agreement, rather than its form, will control. *Kingsbury v. Commissioner*, 65 T.C. at 1085. We accept petitioner's explanation of the language as reasonable, and do not find the language fatal to our characterization of the agreement as a lease.

· Second, respondent asserts that petitioner pays no "rent" to the fleet owners and attacks petitioner's method of accounting for the gross rental fees as being inconsistent with a lease characterization. According to respondent, U-Haul pays no compensation to the fleet owners. Rather, payment to the fleet owner is derived solely from those members of the general public who lease the fleet owner's equipment, and the fleet owner has a property interest in that money from the moment the consumer pays it to the rental dealer. Respondent asserts that this is not a case where a rent is measured by gross receipts; it is a case where the fleet owner *owns* the gross receipts (to the extent of the fleet owner's specific percentage). While we consider respondent's argument positively ingenious, we cannot agree that U-Haul pays no rent. Courts have often found a lessor-lessee relationship where rent is based exclusively on a fixed percentage of the gross income or profits derived from the property rented. See, e.g., *Grandview Mines v. Commissioner, supra; Kingsbury v. Commissioner, supra; McNabb v. United States, supra.*

In the instant case, a fleet owner is entitled to a fixed percentage of the gross rental income derived from U-Haul's activities in leasing the fleet owner's property to members of

the general public, in much the same way as any lessor is entitled to a percentage of income under a percentage lease. We recognize that U-Haul's accounting treatment of the gross rental income is inconsistent with our lease characterization. For accounting purposes, U-Haul does not report the full amount of the gross rental income as income earned. Rather, it reports only the 15 percent that it is entitled to retain. At the time it makes disbursements to the fleet owners, U-Haul does not record these disbursements as expenses. U-Haul's accounting treatment of the transactions is relevant to a proper determination of the relationship between U-Haul and the fleet owners. However, under the facts of this case, we believe that the factors indicative of a lease relationship are considerably more compelling than the inconsistent accounting treatment.

Third, respondent points out that a lease typically conveys rights to the lessee over the property for a fixed term, at the expiration of which the property physically reverts to the lessor. During the fiscal year ended March 31, 1973, two of the standard trailer fleet owner contracts and the standard truck fleet owner contract provided that the equipment would remain in the rental system for a minimum 6–year period. Thereafter, either the fleet owner or U-Haul had the power under certain circumstances to deem the equipment unfit for further operation. The third standard trailer fleet owner contract provided for no minimum term; rather, the trailer would remain in the system until either the owner or U-Haul deemed it unfit. The standard trailer fleet owner contracts further provided that in the event the trailer was deemed unfit, U-Haul would either cause the trailer to be sold for private use and credit the owner with the net sales proceeds, or cause the trailer to be scrapped and credit the owner with the net salvage value, if any. The standard truck fleet owner contract provided solely for U-Haul's sale of an unfit truck and the crediting of the net sales proceeds to the owner. Respondent assets that a term essentially contingent on profit to the owner of the property and the failure to provide for the physical return of the asset to the owner is inconsistent with a lease characterization. We need only say on this point that we do not agree.

We have acknowledged the absence of some traditional lease characteristics. However, we are dealing herein with a unique arrangement tailored to meet the particular needs of both the fleet owners and the U-Haul rental system as a whole. The arrangement is not quickly susceptible of being classified, in accordance with traditional principles, as one type of relationship to the exclusion of another. We can only point out to respondent that the arrangement also lacks many of the characteristics commonly associated with an agency relationship. For example, U-Haul's unqualified right to continue to use a fleet owner's equipment after the fleet owner has sold his interest in the equipment is more indicative of a lease than it is of an agency arrangement. Further, U-Haul possessed the exclusive right to use and possess the fleet owner's equipment. Exclusive use and possession are property rights traditionally transferred by a lease rather than an agency contract. In short, the analysis of the substance of the transaction simply cannot be approached with an inflexible adherence to the hornbook law of agency and lease. Moreover, although the statute does not define "lease" for purposes of section 48, section 1.46–4(d)(4), Income Tax Regs., cross-references section 1.57–3(d)(1), Proposed Income Tax Regs., for the definition of a "lease" for purposes of section 46(e)(3). The proposed regulation defines a lease as "any arrangement or agreement, formal or informal, written or oral, by which the owner of property (the 'lessor') receives consideration in any form for the use of his property by another party." Respondent's insistence that the fleet owner contract is not a lease because it does not resemble the hornbook law's description of a lease is interesting in view of the breadth of the proposed regulations's definition of a lease.

Fourth, respondent attempts to expose the faults of a lease characterization by comparing the operation of company-owned fleets with the operation of independently owned fleets. During the fiscal year at issue, some of Amerco's subsidiaries, primarily rental companies, owned fleets and held fleet owner contracts identical to those held by independent fleet owners. Because the documentation is the same in the case of company-owned fleets and independently owned fleets, respondent concludes that, if this Court holds that the fleet owner contracts constituted leases, then it follows that a rental

company, in its capacity as a fleet owner, leased equipment owned by it to U-Haul, which, in turn, leased the equipment back to the rental company prior to the placement of the equipment with a rental dealer. Respondent contends that the absurdity of such a "lease and leaseback" structure demonstrates that U-Haul was not a lessee under any of the fleet owner contracts. In counterpoint, petitioner explains that a rental company owning U-Haul equipment essentially functioned in two capacities. As a fleet owner, the rental company was required to lease the equipment to U-Haul in order to gain access to the system. The rental company then acted as U-Haul's agent, rather than its lessee, when it placed the equipment with a rental dealer for rentals to the public. A rental company owning U-Haul equipment received, in its capacity as a fleet owner, the same percentage of gross rental income as any fleet owner received. In addition, the company received the specified percentage of gross rental income to which it was entitled in its capacity as a rental company. Petitioner's explanation of the relationship between U-Haul and a rental company owning U-Haul equipment is perfectly reasonable and compatible with the evidence in the record.

Respondent's final argument relates to U-Haul's relationship to Amerco Trust No. 72. During the fiscal year ended March 31, 1973, fifteen fleets of equipment were sold to Amerco Trust Fleet No. 72, a trust composed of employees of Amerco or its subsidiaries. The trustee, acting on behalf of the trust, executed a fleet owner contract with respect to each fleet. Respondent notes that the trailer fleet owner contracts executed by the trust were identical to the trailer fleet owner contracts executed by company and independent fleet owners and that no material difference existed between the operation of the equipment and the prescribed rights and duties of the parties. However, respondent asserts that U-Haul's relationship with the trust was substantially different from its relationship to other fleet owners because of the identity of the trustee of the trust, Arcoa International, Inc.

Respondent seizes upon the fact that Arcoa International, Inc., was the name used by U-Haul during 1970, assumes that the trustee corporation was a predecessor entity of U-Haul, and concludes that at the time of the execution of the trust fleet owner contracts and the elections to pass through the

investment tax credit, U-Haul was essentially dealing with itself. Respondent fleshes out his argument by noting that the passthrough of the investment tax credit is normally an item of negotiation between the parties which reflects itself in the rental rates charged. Finding an absence of this sort of give and take, where U-Haul was essentially dealing with itself, respondent urges the Court to closely scrutinize the fleet owner contracts and the passthrough elections executed by the trust. Petitioner disputes respondent's determination that Arcoa International, Inc., was a predecessor entity of U-Haul, and maintains that Arcoa International, Inc., was a corporation entirely separate from U-Haul or its predecessor and a wholly owned subsidiary of Amerco. We find it unnecessary to determine whether Arcoa International, Inc., was a predecessor entity of U-Haul. The fact is that during the 1973 fiscal year, Arcoa International, Inc., existed as a separate entity from U-Haul. Respondent's suggestion of self-dealing ignores at least two crucial considerations.

First, Arcoa International, Inc., as trustee of Amerco Trust Fleet No. 72, owed a fiduciary duty to act in such a manner as to promote the best interests of the beneficiaries, and there is no evidence in the record that it failed to do so. Second, as respondent concedes, the trailer fleet owner contracts executed by Arcoa International, Inc., on behalf of the trust were identical to those executed by independent fleet owners, indicating that U-Haul made no special concessions in favor of the trust. Hence, we find no evidence of self-dealing to warrant special scrutiny of the passthrough elections executed by the trust.[16]

In cases such as this, it is appropriate for the Court to give great weight to the intent of the parties and their understanding of the relationship created. Accordingly, in reaching our determination that the fleet owner contract constituted a lease, we have taken the following into consideration: (1) Minutes of an early board of directors meeting, dated April 20,

---

[16]Respondent raises an additional point in support of his suggestion of impropriety. Specifically, although the trust initially executed an election to pass the investment tax credit to U-Haul, it later filed an amended return claiming the investment tax credit, itself. Respondent asserts that petitioner's position is that both the trust as "lessor" and U-Haul as "lessee" are entitled to the credit. There is no merit to respondent's suggestion of impropriety. The trust claimed the credit as a protective measure only after the revenue agent disallowed U-Haul's use of the credit, and clearly disclosed the reasons for filing the amended return in a letter attached thereto.

1953, and stipulated into evidence, describe the fleet owner concept as a sale and leaseback arrangement. (2) A copy of a letter to the Securities and Exchange Commission, dated March 23, 1953, and stipulated into evidence, describes the fleet owner contract as a lease contract. (3) During the period from 1960 through 1967, the standard fleet owner contract was entitled "Fleet Owner Lease Contract Rental Trailers." The standard contracts in effect during the fiscal year ended March 31, 1973, largely reflected the provisions of the standard contracts in effect from 1960 through 1967. (4) Corporate officers of U-Haul represented to prospective fleet owners that the fleet owner concept involved a sale and leaseback. (5) During the 1973 fiscal year, 505 out of 513 individual fleet owners and Amerco Trust Fleet No. 72, acting under no apparent compulsion, executed passthrough elections describing themselves as lessors and U-Haul as lessee. These representations and actions are indicative of the practical construction placed upon the terms of the fleet owner contracts by the parties, themselves, in the course of their relationship.

We in no way suggest that this Court will permit taxpayers to obscure the substance of their transaction or manipulate the tax consequences thereof through the mere device of self-serving statements and actions. Such is not the case herein. Long before the enactment of the original investment tax credit provisions in 1962, the fleet owner concept was held out as a sale and leaseback transaction to the Securities and Exchange Commission, State regulatory agencies, and the public. There is no evidence that the representations and dealings between the parties were motivated by tax considerations. Rather, the evidence convincingly establishes that the fleet owner concept was engendered in response to business and economic realities that hindered the development of the U-Haul system. Accordingly, we hold that U-Haul, as lessee, is entitled to the investment tax credit of $319,839.03 on the 37 fleets of trailers, trucks, handtrucks, and towbars placed in service during the fiscal year ended March 31, 1973.

*Decision will be entered under Rule 155.*