# O. Robert Freesen and Alice Freesen, et al.,[1] Petitioners v. Commissioner of Internal Revenue, Respondent

Docket No. 16104–83.    Filed May 20, 1985.

---

[1]The following petitioners were also included in the petition: James R. Buhlig and Diane Buhlig; Kenneth T. Cox and Shirley I. Cox; Eugene J. Kroencke and Sarah R. Kroencke; Russell M. Mosley and Ruth A. Mosley; Keith B. Prunty and Norma J. Prunty; Jeffrey C. Prunty and Vickie Prunty; Kerry S. Freesen and Carol A. Freesen; Thomas L. Oetgen and Kathleen E. Oetgen; and Oscar R. Freesen and Debra Freesen.

*Theodore C. Rammelkamp, Jr.,* for the petitioners.
*Michael W. Bitner,* for the respondent.

GOFFE, *Judge*: The commissioner determined deficiencies in petitioners' Federal income tax as follows:

| Petitioner | Taxable year | Amount |
|---|---|---|
| O. Robert Freesen | 1978 | $18,215.84 |
| and Alice Freesen | 1979 | 12,565.99 |
| | 1980 | 3,611.84 |
| | | |
| James R. Buhlig | 1978 | 15,795.97 |
| and Diane Buhlig | 1979 | 9,051.76 |
| | 1980 | 2,627.95 |
| | | |
| Kenneth T. Cox | 1978 | 16,635.44 |
| and Shirley I. Cox | 1979 | 10,500.64 |
| | 1980 | 333.33 |
| | | |
| Eugene J. Kroencke | 1978 | 15,631.85 |
| and Sarah R. Kroencke | 1979 | 7,418.28 |
| | 1980 | 682.39 |
| | | |
| Russell M. Mosley | 1978 | 16,005.38 |
| and Ruth A. Mosley | 1979 | 7,358.54 |
| | 1980 | 640.86 |
| | | |
| Keith B. Prunty | 1978 | 16,401.29 |
| and Norma J. Prunty | 1979 | 10,841.06 |
| | 1980 | 2,628.29 |
| | | |
| Jeffrey C. Prunty | 1978 | 18,400.24 |
| | | |
| Jeffrey C. Prunty | 1979 | 9,213.16 |
| and Vickie Prunty | 1980 | 2,628.28 |

| Petitioner | Taxable year | Amount |
|---|---|---|
| Kerry S. Freesen | 1978 | $15,720.08 |
| Carol A. Freesen | 1979 | 9,265.18 |
| | 1980 | 2,440.72 |
| | | |
| Thomas L. Oetgen | 1978 | 16,218.11 |
| and Kathleen E. Oetgen | 1979 | 11,108.27 |
| | 1980 | 2,628.28 |
| | | |
| Oscar R. Freesen | 1978 | 15,675.60 |
| and Debra Freesen | 1979 | 8,735.05 |
| | 1980 | 1,808.33 |

After concessions by the parties, the issues for decision are: (1) Whether certain heavy construction equipment purchased and owned by Freesen Equipment Co. (a subchapter S corporation of which petitioners are the sole stockholders) during the taxable years 1978, 1979, and 1980, was subject to a lease for the purposes of section 46(e)(3);[2] (2) assuming that the above question is answered in the affirmative, whether the transactions in issue satisfied the noncorporate lessor provisions of section 46(e)(3); and (3) whether the heavy construction equipment described in the first issue for decision was subject to a lease for the purposes of section 57(a)(3), so as to require that any claimed depreciation in excess of straight line be treated as a tax preference item.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and accompanying exhibits are so found and incorporated herein by reference.

All of the petitioners resided in Illinois during the taxable years in issue and when their joint petition was filed. With exception of petitioner Jeffrey C. Prunty who filed an individual Federal income tax return for the taxable year 1978, all of the petitioners filed joint Federal income tax returns with their respective spouses for the taxable years in issue. All of petitioners' Federal income tax returns for the taxable years

[2] All section and subchapter references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue, and all Rule references are to this Court's Rules of Practice and Procedure.

in issue were timely filed with the Internal Revenue Service's Kansas City Service Center.

During the taxable years in issue, Freesen Equipment Co. was a corporation which was organized under the laws of the State of Nevada. During this period, Freesen Equipment Co. qualified for, and chose to be, an "electing small business corporation" under subchapter S of the Internal Revenue Code. The following petitioners owned Freesen Equipment Co. in the indicated amounts during the years before the Court:

| Petitioner | Amount |
|---|---|
| O. Robert Freesen | 10% |
| James R. Buhlig | 10 |
| Kenny T. Cox | 10 |
| Eugene J. Kroencke | 10 |
| Russell Mosley | 10 |
| Keith Prunty | 10 |
| Jeffrey C. Prunty | 10 |
| Kerry S. Freesen | 10 |
| Thomas L. Oetgen | 10 |
| Oscar R. Freesen III | 10 |
| Total | 100 |

During the taxable years in issue, Freesen, Inc., was a corporation which was organized under the laws of the State of Nevada. During this period, Freesen, Inc., was, for Federal income tax purposes, operated pursuant to subchapter C of the Internal Revenue Code. During the taxable years in issue, petitioners were not the sole stockholders of Freesen, Inc. The shares of Freesen, Inc., were held as follows at the dates indicated:

| | SHARES | | |
|---|---|---|---|
| Shareholders | May 1, 1978 | June 1, 1979 | Oct. 1, 1980 |
| O. Robert Freesen | 1,856 | 9,784 | 9,840 |
| Keith B. Prunty | 211 | 1,055 | 0 |
| Kenneth T. Cox | 220 | 1,100 | 0 |
| L. Leroy Freesen | 112 | 56 | 0 |
| William F. Nunes | 72 | 360 | 435 |
| Gerald E. Day | 45 | 225 | 265 |
| Vivian H. Bentley, Jr. | 44 | 220 | 220 |
| Thomas L. Oetgen | 37 | 185 | 375 |
| J. Craig Prunty | 36 | 180 | 245 |
| Eugene J. Kroencke | 30 | 150 | 175 |
| O.R. Freesen III | 28 | 140 | 157 |
| James R. Buhlig | 23 | 115 | 280 |

| | SHARES | | |
|---|---|---|---|
| *Shareholders* | *May 1, 1978* | *June 1, 1979* | *Oct. 1, 1980* |
| Robert J. Henkhaus | 20 | 100 | 100 |
| Kerry S. Freesen | 18 | 90 | 130 |
| Glen C. Clevenger | 13 | 65 | 77 |
| Matthew Freesen | 13 | 65 | 65 |
| Guy Freesen | 13 | 65 | 65 |
| James A. McLaughlin | 13 | 65 | 85 |
| Russell M. Mosley | 10 | 50 | 107 |
| Samuel R. Killebrew | 8 | 40 | 90 |
| Barry E. Bringman | 5 | 25 | 45 |
| Max L. Edlen | 5 | 25 | 36 |
| Joseph Brown | 4 | 20 | 0 |
| James W. Claussen | 4 | 20 | 55 |
| Edgar A. Bobb | 0 | 0 | 31 |
| John Steinberg | 0 | 0 | 10 |
| Don E. Davis | 0 | 0 | 10 |
| Lowell Yocom | 0 | 0 | 10 |
| Stephen J. Cobb | 0 | 0 | 6 |
| James C. Littig | 0 | 0 | 5 |
| Willard Tranbarger | 0 | 0 | 2 |
| Treasury | 0 | 0 | 1,279 |
| Total | 2,840 | 14,200 | 14,200 |

During the taxable years in issue, Freesen, Inc., was a construction contractor whose business consisted primarily of road contracting with a strong secondary interest in land clearing operations. In the course of its business, Freesen, Inc., entered into the following agreements entitled "Contract for Topsoil Removal" with Peabody Coal Co. (hereinafter referred to as Peabody):

| *Date of agreement* | *Term* | *Location* |
|---|---|---|
| Jan. 11, 1978 | Mar. 1, 1978—Feb. 28, 1979 | Power Mine |
| Apr. 13, 1979 | May 1, 1979—Apr. 30, 1980 | Power Mine |
| Apr. 9, 1980 | May 1, 1980—Apr. 30, 1981 | Power Mine |
| Jan. 11, 1978 | Mar. 1, 1978—Feb. 28, 1979 | Tebo Mine |
| Apr. 13, 1979 | May 1, 1979—Apr. 30, 1980 | Tebo Mine |

Pursuant to these agreements, Freesen, Inc., contracted to excavate, remove, and replace (after mining and grading by Peabody), and stockpile as required, all of the topsoil material at the indicated mine sites which were located in Henry and Johnson counties in the State of Missouri. These contracts for topsoil removal were entered into by Peabody with Freesen, Inc., in order that Peabody might have the benefit of Freesen,

Inc.'s management and expertise in topsoil removal. Such management and expertise were, in fact, provided during the performance of these agreements.

Pursuant to paragraph 1 of all of the above-described contracts for topsoil removal, Freesen, Inc., was obligated to provide all of the equipment, supervisory labor, and maintenance labor necessary for the topsoil removal at the two mine sites. Pursuant to paragraph 2(b) of these agreements, either party had the right to terminate such contracts for its own convenience by delivering written notice thereof to the other party. Further, pursuant to paragraph 3 of these agreements, subject to monthly standby provisions whereby Freesen, Inc., was to be compensated for making specified equipment available, Peabody was obligated to pay hourly or monthly rates for the usage of the equipment provided by Freesen, Inc., which equipment was to be operated by Peabody's employees.

Freesen, Inc., did not own all of the equipment necessary for the performance of the above-described contracts for topsoil removal. Road contracting, such as Freesen, Inc., performs in the normal course of its business, requires significant amounts of unimpaired equity capital in order to satisfy requirements imposed by State governments and commercial bonding companies. Had Freesen, Inc., purchased the equipment called for by the contracts for topsoil removal, its capital would have been severely impaired, hindering its ability to pursue its major line of business, road contracting. Therefore, in 1978, petitioners formed Freesen Equipment Co. in order to provide the necessary equipment and capital to perform the above-described contracts for topsoil removal without impairing the capital of Freesen, Inc. For its initial capitalization, each shareholder contributed $10,000 cash to Freesen Equipment Co.

On March 23, 1978, Freesen, Inc., and Freesen Equipment Co. entered into a "Joint Venture Agreement," the pertinent portions of which provided as follows:

JOINT VENTURE AGREEMENT

On this 23 day of March, 1978, FREESEN INC., a Nevada Corporation, hereinafter referred to as "Inc.", and FREESEN EQUIPMENT CO., a Nevada Corporation, hereinafter referred to as "Equipment Co.", agree to engage in and carry on as joint venturers (for profit) to complete the contracts dated January 11, 1978 between FREESEN INC. and PEABODY

COAL COMPANY, for topsoil removal at Peabody's Power Mine located in Henry County, Missouri, and Peabody's Tebo Mine located in Henry and Johnson Counties, Missouri, and hereinafter referred to as the "Peabody Contract". Such enterprise will have its main office at Bluffs, Illinois.

In consideration of the mutual promises made herein, the parties agree as follows:

I. *Contributions*

A. Inc. shall contribute the equipment and services more particularly described in Exhibit A attached hereto and made a part hereof.

B. Equipment Co. shall contribute the equipment and services more particularly described in Exhibit B attached hereto and made a part hereof.

C. The parties shall make their contribution at the time performance under the Peabody contract described above shall commence.

D. If either party fails to make its contribution within thirty (30) days of notice of failure to do so, then the other party can declare the joint venture null and void and secure its share of the profits.

II. *Rights, Powers and Duties*

A. Equipment Co. shall assume the duties shown in Exhibit B to this agreement and Inc. shall assume the duties shown in Exhibit A.

B. The parties designate Inc. as the sponsoring joint venturer. The Peabody contract shall be carried out and performed on behalf of the joint venture under the direction of the sponsoring joint venturer, acting through such of its officers, employees or agents as it may hereafter at any time or from time to time designate.

III. *Division of Profits/Loss*

A. Inc. shall collect, receive and deposit all sums due, earned and paid under the Peabody contract.

B. Equipment Co. shall bill Inc. monthly for advances on equipment usage and the actual costs for service personnel, insurance, taxes, fuel and lubricants, and parts replaced or repaired on vehicles repaired or replaced under the services and maintenance provisions of this agreement. Inc. shall pay Equipment Co. for such billings on a monthly basis.

C. At the end of the calendar year of each year this joint venture is in force and upon completion of the Peabody contract, the parties shall make a general accounting of net profits and loss after allocation of costs of the joint venture. The first $1,100,000.00 of net profit shall be paid to Equipment Co. The next $2,200,000.00 of net profit shall be paid to Inc. Any net profit over $3,300,000.00 shall be divided equally between the parties.

D. Losses shall be shared on the same proportional basis as profits are to be distributed.

IV. *Bank Accounts*

All funds advanced by the parties to this agreement and all progress and final payments or other revenue received as the result of the performance of the Peabody contract may be deposited to the account of the joint venture established at such bank or banks as the sponsoring joint venturer may designate. All joint venturers will be advised by the sponsoring joint venturer as to any bank accounts established.

Checks may be drawn on such account or accounts by signature or signatures of such persons as may be designated by the sponsoring venturer

from time to time. Unless and until otherwise agreed, the sponsoring venturer is authorized to designate the persons to be authorized to draw checks on the bank account or accounts.

The joint venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the sponsoring joint venturer may designate. Checks may be drawn on such accounts by signature or signatures of such persons as may be designated by the sponsoring joint venturer. Without limiting the right of the sponsoring joint venturer to change the persons authorized to sign on the various bank accounts that may be established as provided herein, any one of the following persons is authorized to sign checks drawn on the designated accounts:

Thomas Oetgen, Keith Prunty, Craig Prunty, and Jim Buhlig

V. *Books of Accounts; Audits*

A. Adequate books of account shall be maintained by each joint venturer. Such books of account may be examined by any of the joint venturers at any reasonable time.

B. A periodic audit of such books may be made by an independent firm of certified public accountants as agreed by the parties. Copies of such audit reports shall be delivered to each joint venturer.

VI. *Limitation of Joint Venture*

It is specifically understood and agreed between the parties that this joint venture agreement extends only for the performance of the Peabody contract, together with any changes or additions thereto or extra work thereunder; in no event shall this agreement extend to or cover any or different work. Nor does this agreement create any permanent partnership agreement or joint venture agreement to bid or undertake any additional work. Nothing in this agreement shall be construed as a limitation of the powers or rights of any party to carry on its separate business for its sole benefit except, however, that the parties shall cooperate with one another according to the terms and spirit of this agreement in the performance of the Peabody contract.

\*      \*      \*      \*      \*      \*      \*

### EXHIBIT A TO JOINT VENTURE AGREEMENT BETWEEN FREESEN INC. and FREESEN EQUIPMENT CO.

FREESEN INC. shall contribute and perform the following in completion of the Peabody contract and this Joint Venture Agreement:

1. All supervision and direction of the work and operations described in the Peabody contract including, but not limited to, all necessary supervisory personnel and support facilities not otherwise provided by FREESEN EQUIPMENT CO.;

2. Certain equipment and trucks including, but not limited to:

a. Pickup trucks for Freesen Inc. supervisory personnel

\*      \*      \*      \*      \*      \*      \*

3. Any additional labor, materials, equipment necessary to perform any work unrelated to topsoil removal as required by paragraph 1(b) of the Peabody contract. Such contribution may be made after the commencement of work on the contract and failure to make such contribution with other contributions shall not be a cause for failure of Inc. to perform the Joint Venture Agreement.

EXHIBIT B TO JOINT VENTURE AGREEMENT BETWEEN
FREESEN INC. and FREESEN EQUIPMENT CO.

FREESEN EQUIPMENT CO. shall contribute and perform the following in completion of the Peabody contract and this Joint Venture Agreement:

1. Furnish and deliver to the mine site the following equipment and vehicles necessary to assist in the removal of topsoil as required by the Peabody contract:

a. 10 Caterpillar 631D Tractor-Scraper Units
b. 3 Caterpillar D-9H Crawler Tractor Units
c. 3 Caterpillar D-8K Crawler Tractor Units
d. 2 Caterpillar 16G Motorgraders
e. 2 Caterpillar 621B Tractor with Klein KT-7000 Water Wagons
f. Trucks

2. Service and maintain all equipment and vehicles delivered to the mine site by Equipment Co. and by Inc. Service and maintenance shall include but not be limited to: (a) changing and checking gas, diesel, fuel, oil, lubrication and filters; (b) inspecting, repairing, replacing worn, defective and damaged parts to engines, transmissions, hydraulic controls and systems, brakes, drive trains, steering, final drive, steering clutches, undercarriage and to any other part of the equipment and vehicles which fail to function properly; (c) furnishing sufficient supervisory personnel and other labor, if required, to carry out and supervise all such changing, checking, inspecting, replacing and completing work necessary to service and maintain the equipment and vehicles delivered under this agreement in an operable condition.

3. Remove and pick up any equipment and vehicles which need to be removed from the mine site during the course of this agreement, whether on a temporary or permanent basis and regardless of whether Inc. or Equipment Co. delivered the equipment and vehicles to the mine site.

4. Purchase fuel for the equipment and vehicles delivered to the mine site by Inc. or Equipment Co., deliver such fuel to the mine site and cause the equipment and vehicles of Inc. and Equipment Co. at the mine site to be fueled every day said equipment and vehicles are used in performing the Peabody contract.

5. Provide security and protective services to guard the equipment and vehicles of Equipment Co. and Inc. at the mine site on off hours, weekends and holidays against theft, vandalism, and other related crimes.

6. Procure and maintain in force insurance on the equipment and vehicles furnished and delivered by Equipment Co. to the mine site. The insurance shall provide coverage for personal injury and death, property damage and extended coverage with reasonable limits of coverage.

7. Administer, investigate and process any and all claims for loss, property damage, personal injury or death arising out of the operations of Inc. or Equipment Co. in the performance of the Peabody contract and this joint venture. Equipment Co. by performing these services shall not assume the duties of or in any way prejudice the rights of any insurance carrier of Inc., Equipment Co. or Peabody Coal Company.

8. Establish and maintain adequate service-logs on each item of equipment delivered and used at the mine site for performance of the Peabody contract. These records shall be kept on a daily basis by personnel of Freesen Equipment Co. and shall contain the hours each is used, dates of oil and filter changes, oil sample analyses, systems inspection reports, hour meter readings, and mechanics repair summaries.

On April 23, 1979, Freesen, Inc., and Freesen Equipment Co. entered into a "Continuation of Joint Venture Agreement," the pertinent portions of which provided as follows:

### CONTINUATION OF JOINT VENTURE AGREEMENT

WHEREAS, on the 23rd day of March, 1978, FREESEN INC., a Nevada Corporation, and FREESEN EQUIPMENT CO., a Nevada Corporation, did enter into an agreement to engage in and carry on as joint venturers (for profit) to complete certain contracts dated January 11, 1978, between FREESEN INC. and PEABODY COAL COMPANY for topsoil removal at Peabody's Power Mine and Tebo Mine, said contracts being for a term of one year commencing May 1, 1978, and

WHEREAS, on the 13th day of April, 1979, FREESEN INC. did enter into renewal of said contracts with PEABODY COAL COMPANY for topsoil removal at Peabody's Power Mine and Tebo Mine, said renewal contracts being for a term of one year, commencing May 1, 1979, and

WHEREAS, FREESEN INC. and FREESEN EQUIPMENT CO. desire to continue as joint venturers (for profit) to complete the contracts dated April 13, 1979, between FREESEN INC. and PEABODY COAL COMPANY for topsoil removal at Peabody's Power Mine and Tebo Mine,

Now, THEREFORE, BE IT RESOLVED by and between FREESEN INC. and FREESEN EQUIPMENT CO., the Parties hereto, that all terms and conditions of the joint venture agreement entered into by and between said Parties on the 23rd day of March, 1978, shall remain in full force and effect until the contracts between FREESEN INC. and PEABODY COAL COMPANY dated April 13, 1979, have been completed.

On April 28, 1980, Freesen, Inc., and Freesen Equipment Co. entered into a "Joint Venture Agreement," the pertinent portions of which provided as follows:

## JOINT VENTURE AGREEMENT

On this 28 day of April, 1980 FREESEN INC., a Nevada Corporation, hereinafter referred to as "Inc.", and FREESEN EQUIPMENT CO., a Nevada Corporation, hereinafter referred to as "Equipment Co.", agree to engage in and carry on as joint venturers (for profit) to complete the contracts dated April 9, 1980, between FREESEN INC. and PEABODY COAL CO., for topsoil removal at Peabody's Power Mine located in Henry County, Missouri, ..............................................................................and hereinafter referred to as the "Peabody Contract". Such enterprise will have its main office at Bluffs, Illinois.

In consideration of the mutual promises made herein, the parties agree as follows:

I. *Contributions*

A. Inc. shall contribute the equipment and services more particularly described in Exhibit A attached hereto and made a part hereof.

B. Equipment Co. shall contribute the equipment and services more particularly described in Exhibit B attached hereto and made a part hereof.

C. The parties shall make their contribution at the time performance under the Peabody contract described above shall commence.

D. If either party fails to make its contribution within thirty (30) days of notice of failure to do so, then the other party can declare the joint venture null and void and secure its share of the profits.

II. *Rights, Powers and Duties*

A. Equipment Co. shall assume the duties shown in Exhibit B to this agreement and Inc. shall assume the duties shown in Exhibit A.

B. The parties designate Inc. as the sponsoring joint venturer. The Peabody contract shall be carried out and performed on behalf of the joint venture under the direction of the sponsoring joint venturer, acting through such of its officers, employees or agents as it may hereafter at any time or from time to time designate.

III. *Division of Profits/Loss*

A. Inc. shall collect, receive and deposit all sums due, earned and paid under the Peabody contract.

B. Equipment Co. shall bill Inc. monthly for advances on equipment useage [sic] and the actual costs for service personnel, insurance, taxes, fuel and lubricants, and parts replaced or repaired on vehicles repaired or replaced under the services and maintenance provision of this agreement. Inc. shall pay Equipment Co. for such billings on a monthly basis.

C. At the end of the calendar year of each year this joint venture is in force and upon completion of the Peabody contract, the parties shall make a general accounting of net profits and loss after allocation of costs of the joint venture. The first $900,000.00 of net profit shall be paid to Equipment Co. The next $2,200,000.00 of net profit shall be paid to Inc. Any net profit over $3,100,000.00 shall be divided equally between the parties.

D. Losses shall be shared on the same proportional basis as profits are to be distributed.

IV. *Bank Accounts*

All funds advanced by the parties to this agreement and all progress and final payments or other revenue received as the result of the performance of the Peabody contract may be deposited to the account of the joint venture established at such bank or banks as the sponsoring joint venturer may designate. All joint venturers will be advised by the sponsoring joint venturer as to any bank accounts established.

Checks may be drawn on such account or accounts by signature or signatures of such persons as may be designated by the sponsoring venturer from time to time. Unless and until otherwise agreed, the sponsoring venturer is authorized to designate the persons to be authorized to draw checks on the bank account or accounts.

The joint venture may also maintain payroll or other accounts at such bank or at such branch or at such other bank as the sponsoring joint venturer may designate. Checks may be drawn on such accounts by signature or signatures of such persons as may be designated by the sponsoring joint venturer. Without limiting the right of the sponsoring joint venturer to change the persons authorized to sign on the various bank accounts that may be established as provided herein, any of the following persons is authorized to sign checks drawn on the designated accounts:

Any Corporation officer of the sponsoring joint venturer

V. *Books of Accounts; Audits*

A. Adequate books of account shall be maintained by each joint venturer. Such books of account may be examined by any of the joint venturers at any reasonable time.

B. A periodic audit of such books may be made by an independent firm of certified public accountants as agreed by the parties. Copies of such audit reports shall be delivered to each joint venturer.

\* \* \* \* \* \* \*

EXHIBIT A TO JOINT VENTURE AGREEMENT BETWEEN FREESEN INC. and FREESEN EQUIPMENT CO.

FREESEN INC. shall contribute and perform the following in completion of the Peabody contract and this Joint Venture Agreement:

1. All supervision and direction of the work and operations described in the Peabody contract including, but not limited to, all necessary supervisory personnel and support facilities not otherwise provided by FREESEN EQUIPMENT CO.;

2. Certain equipment and trucks including, but not limited to:

a. Pickup trucks for Freesen Inc. supervisory personnel

\* \* \* \* \* \* \*

3. Any additional labor, materials, equipment necessary to perform any work unrelated to topsoil removal as required by paragraph 1(b) of the Peabody contract. Such contribution may be made after the commencement of work on the contract and failure to make such contribution with other

contributions shall not be a cause for failure of Inc. to perform the Joint Venture Agreement.

### EXHIBIT B TO JOINT VENTURE AGREEMENT BETWEEN FREESEN INC. and FREESEN EQUIPMENT CO.

FREESEN EQUIPMENT CO. shall contribute and perform the following in completion of the Peabody contract and this Joint Venture Agreement:

1. Furnish and deliver to the mine site the following equipment and vehicles necessary to assist in the removal of topsoil as required by the Peabody contract:

(10) Caterpillar 631D Tractor-Scraper Units

( 3) Caterpillar D-9H Crawler Tractor/Dozer Units

( 4) Caterpillar D-8K Crawler Tractor/Dozer Units

( 2) Caterpillar 16G Motor Graders

( 1) Caterpillar 920 Wheel Tractor Loader

( 2) Caterpillar 621B Tractors w/Klein KT7000 Water Wagons

( 1) Caterpillar DW21 Tractor w/8000 gallon water wagon

Trucks—Mechanic, Service and Grease

Mobile Office

2. Service and maintain all equipment and vehicles delivered to the mine site by Equipment Co. and by Inc. Service and maintenance shall include but not be limited to: (a) changing and checking gas, diesel, fuel, oil, lubrication and filters; (b) inspecting, repairing, replacing worn, defective and damaged parts to engines, transmissions, hydraulic controls and systems, brakes, drive trains, steering, final drive, steering clutches, undercarriage and to any other part of the equipment and vehicles which fail to function properly; (c) furnishing sufficient supervisory personnel and other labor, if required, to carry out and supervise all such changing, checking, inspecting, replacing and completing work necessary to service and maintain the equipment and vehicles delivered under this agreement in an operable condition.

3. Remove and pick up any equipment and vehicles which need to be removed from the mine site during the course of this agreement, whether on a temporary or permanent basis and regardless of whether Inc. or Equipment Co. delivered the equipment and vehicles to the mine site.

4. Purchase fuel for the equipment and vehicles delivered to the mine site by Inc. or Equipment Co., deliver such fuel to the mine site and cause the equipment and vehicles of Inc. and Equipment Co. at the mine site to be fueled every day said equipment and vehicles are used in performing the Peabody contract.

5. Provide security and protective services to guard the equipment and vehicles of Equipment Co. and Inc. at the mine site on off hours, weekends and holidays against theft, vandalism, and other related crimes.

6. Procure and maintain in force insurance on the equipment and vehicles furnished and delivered by Equipment Co. to the mine site. The insurance shall provide coverage for personal injury and death, property damage and extended coverage with reasonable limits of coverage.

7. Administer, investigate and process any and all claims for loss, property damage, personal injury or death arising out of the operations of Inc. or Equipment Co. in the performance of the Peabody contract and this joint venture. Equipment Co. by performing these services shall not assume the duties of or in any way prejudice the rights of any insurance carrier of Inc., Equipment Co. or Peabody Coal Company.

8. Establish and maintain adequate service-logs on each item of equipment delivered and used at the mine site for performance of the Peabody contract. These records shall be kept on a daily basis by personnel of Freesen Equipment Co. and shall contain the hours each is used, dates of oil and filter changes, oil sample analyses, systems inspection reports, hour meter readings, and mechanics repair summaries.

Pursuant to its obligations under the joint venture agreements,[3] Freesen Equipment Co. purchased the equipment required thereby on the dates and at the prices, with such equipment having the useful lives as shown on page 935.

In a letter dated December 17, 1979, Peabody exercised its termination option with respect to the contract for topsoil removal for the Tebo Mine dated April 13, 1979. The termination took effect on February 15, 1980. Otherwise, the parties performed all of the terms of the contracts for topsoil removal in the manner required by the contracts.

The equipment purchased by Freesen Equipment Co. pursuant to its obligations to Freesen, Inc., under the joint venture agreements was placed into service by Freesen Equipment Co. during the taxable years in which such equipment was purchased.

On their Federal income tax returns for the taxable years in issue, petitioners (as shareholders of Freesen Equipment Co., a subchapter S corporation) claimed accelerated depreciation deductions with respect to the equipment purchased by Freesen Equipment Co. Petitioners also claimed investment tax credit concerning this equipment as follows:

|  | Taxable year | | |
| Petitioner | 1978 | 1979 | 1980 |
| O. Robert Freesen and Alice Freesen | $12,692.50 | $826.22 | $333.33 |
| James R. Buhlig and Diane Buhlig | 12,692.50 | 826.22 | 333.00 |

---

[3]For discussion purposes hereafter, all references to the joint venture agreements include all joint venture agreements and the continuation venture agreement.

|                                              | Taxable year | | |
| Petitioner                                   | 1978         | 1979      | 1980      |
| --- | --- | --- | --- |
| Kenneth T. Cox and Shirley I. Cox            | $12,693.50   | $826.00   | $333.33   |
| Eugene J. Kroencke and Sarah R. Kroencke     | 12,700.00    | 826.00    | 333.33    |
| Russell M. Mosley and Ruth A. Mosley         | 12,692.51    | 826.22    | 333.00    |
| Keith B. Prunty and Norma J. Prunty          | 12,692.50    | 826.00    | . 333.33  |
| Jeffrey C. Prunty                            | 12,692.50    | 0         | 0         |
| Jeffrey C. Prunty and Vickie Prunty          | 0            | 826.22    | 333.33    |
| Kerry S. Freesen and Carol A. Freesen        | 12,692.50    | 826.22    | 333.00    |
| Thomas L. Oetgen and Kathleen E. Oetgen      | 12,692.51    | 826.22    | 333.33    |
| Oscar R. Freesen and Debra Freesen           | 12,692.50    | 826.22    | 333.00    |

In the notices of deficiency mailed to petitioners, the Commissioner determined that the equipment purchased by Freesen Equipment Co. did not qualify as section 38 property.[4] The Commissioner also determined that the property in question was subject to a lease and that it had not been shown that the noncorporate lessor provisions of section 46(e)(3) had been met with respect to such property.[5] Finally, the Commissioner determined that a portion of the accelerated depreciation deductions claimed by Freesen Equipment Co. on its 1978, 1979, and 1980 Federal income tax returns constituted items of tax preference to petitioners as the stockholders of Freesen Equipment Co. pursuant to section 57 and accompanying regulations because: (1) The property was subject to a lease for purposes of section 57(a)(3) and (2) it had not been shown that the accelerated depreciation deductions claimed by Freesen Equipment Co. with respect to the property were less than the allowable deductions had the straight line method of depreciation been utilized.[6]

---

[4]Respondent now acknowledges that this equipment is sec. 38 property.

[5]Respondent also acknowledges that if the Court holds that the equipment in issue purchased by Freesen Equipment Co. was not subject to a lease, petitioners are entitled to the investment tax credit claimed on their returns in issue and it will not be necessary for the Court to determine whether the noncorporate lessor provisions of sec. 46(e)(3) have been satisfied.

[6]Respondent acknowledges that if the Court decides that the property in issue purchased by Freesen Equipment Co. is not subject to a lease for the purposes of sec. 57(a)(3), then the

| Date | Quantity | Description | Useful life | Cost |
|---|---|---|---|---|
| March 1978 | 10 | Caterpillar 631 D tractor scraper units (new) | 10,000 hours (5 years) | $2,075,459 |
| March 1978 | 3 | Caterpillar D-911 tractors (new) | 10,000 hours (5 years) | 597,801 |
| March 1978 | 3 | Caterpillar D-8K crawler tractors | 10,000 hours (5 years) | 426,584 |
| March 1978 | 2 | Caterpillar 16 G motor graders (new) | 10,000 hours (5 years) | 258,372 |
| March 1978 | 2 | Caterpillar 621 B tractors | 10,000 hours (5 years) | 279,079 |
| March, April 1978 | - - - | Miscellaneous trucks buses and trailers (new and used) | 4 years | 136,744 |
| May 1978 | 1 | 8000 gallon G.M. water truck (new) | 5 years | 33,713 |
| April 1979 | 1 | Caterpillar 920 wheel tractor loader (new) | 5 years | 47,000 |
| April 1979 | 1 | Caterpillar D-8K crawler tractor (new) | 10,000 hours (5 years) | 153,067 |
| August 1980 | 2 | Caterpillar 631 C tractors (used) | 10,000 hours (5 years) | 348,000 |

OPINION

The first issue for decision is whether certain heavy construction equipment purchased and owned by Freesen Equipment Co. during the years 1978, 1979, and 1980 was subject to a lease for the purposes of section 46(e)(3). In the notices of deficiency mailed to the petitioners, the Commissioner determined that such heavy construction equipment was subject to a lease. The Commissioner's determination is presumptively correct (*Welch v. Helvering*, 290 U.S. 111, 115 (1933)), and petitioners bear the burden of proving it to be erroneous. Rule 142(a).

Petitioners maintain that the joint venture agreements between Freesen, Inc., and Freesen Equipment Co. are not leases under both the control and risk of loss tests of *Meagher v. Commissioner*, T.C. Memo. 1977–270. Petitioners also assert that it is unfair to characterize the joint venture agreements as leases, where the transaction was structured at arm's length for valid business reasons. In support thereof, they claim that the Commissioner's determination that the joint venture agreements are leases for section 46(e)(3) purposes is inconsistent with respondent's stipulation that Freesen Equipment Co. qualified as and chose to be "an electing small business corporation" under subchapter S in that the joint venture agreements did not produce rents so as to disqualify its subchapter S election.

Respondent contends that the joint venture agreements between Freesen, Inc., and Freesen Equipment Co. are leases for section 46(e)(3) purposes. In support thereof, respondent asserts that a review of the parties' contributions and responsibilities under the joint venture agreements in light of applicable case law and regulations warrants a conclusion that these operating documents were, in reality, leases. Respondent disputes petitioners' claim that, pursuant to the joint venture agreements, Freesen Equipment Co. exercised sufficient control over the topsoil removal activities and retained a sufficient risk of loss so as to preclude a lease characterization for

accelerated depreciation deductions will not constitute items of tax preference to petitioners. Further, petitioners acknowledge that if the Court determines that such property is subject to a lease, then the Commissioner's determination that such accelerated depreciation deductions constitute items of tax preference is correct.

section 46(e)(3) purposes. Respondent also claims that the definition of a lease set forth in section 1.57–3(d)(1), Proposed Income Tax Regs., is controlling as this proposed provision was promulgated with explicit congressional authority under section 38(b) and is a reasonable and consistent interpretation of the statute. Finally, respondent rejects petitioners' claim that the stipulation that Freesen Equipment Co. was a valid subchapter S corporation during the years in issue is inconsistent with the Commissioner's determination that the joint venture agreements are leases for section 46(e)(3) purposes.

Section 46(e)(3)[7] contains several qualification requirements concerning a noncorporate lessor's entitlement to investment tax credit with respect to the leased property. No statutory provisions, however, define the term "lease" for the purposes of this section.

Respondent devotes considerable attention on brief to his position that the definition of "lease" as contained in section 1.57–3(d)(1), Proposed Income Tax Regs., is controlling and precludes any nonleasing characterization. As we recently observed in *Amerco v. Commissioner*, 82 T.C. 654, 682 (1984), this proposed regulation defines the term "lease" in an extremely broad manner, i.e., "any arrangement or agreement, formal or informal, written or oral, by which the owner of property (the 'lessor') receives consideration in any form for the use of his property by another party." Although this definition of a lease has remained in the proposed stage for over 14 years[8] respondent nevertheless contends that it has

[7]Sec. 46(e)(3) provides in relevant part that:

SEC. 46(e). LIMITATIONS WITH RESPECT TO CERTAIN PERSONS.—

(3) NONCORPORATE LESSORS.—A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if—

(A) the property subject to the lease has been manufactured or produced by the lessor, or

(B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.

In the case of property of which a partnership is the lessor, the credit otherwise allowable under section 38 with respect to such property to any partner which is a corporation shall be allowed notwithstanding the first sentence of this paragraph. For purposes of this paragraph, an electing small business corporation (as defined in section 1371) shall be treated as a person which is not a corporation.

[8]This proposed regulation first appeared in the Federal Register on Dec. 30, 1970. 35 Fed. Reg. 19769 (1970).

the effect of law. In support thereof, respondent observes that section 1.46–4(d)(4), Income Tax Regs., provides that "For purposes of determining under this paragraph [I.R.C. section 46(e)(3)] whether property is subject to a lease, the provisions of section 1.57–3(d)(1) [Proposed Income Tax Regs.] (relating to definition of a lease) shall apply." Citing *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), and other cases, respondent then asserts "that the regulation here in question is a reasonable and consistent interpretation of the statute, and must, therefore, be upheld."

Respondent also asserts that, because the regulations under section 46(e)(3) were promulgated with explicit congressional authority pursuant to section 38(b), the "customary deference" of the courts to respondent's regulations "is particularly appropriate." *Commissioner v. Portland Cement Co. of Utah*, 450 U.S. 156, 169 (1981). Respondent adds that "it is of no consequence that [section 1.46–4(d)(4), Income Tax Regs.] does not itself contain a definition of a 'lease,' but instead incorporates by reference the definition contained in Proposed Treas. Reg. section 1.57–3(d)(1)."

Finally, after concluding that the legislative history accompanying the enactment of section 46(e)(3) warrants a finding that the proposed definition is valid, respondent contends that the lack of substantive changes made by Congress to section 46(e)(3), subsequent to its enactment, indicates that Congress "has tacitly approved" section 1.46–4(d)(4), Income Tax Regs., and its cross-reference to the definition of the term "lease" in section 1.57–3(d)(1), Proposed Income Tax Regs. In support of this claim, respondent observes that, since the adoption of section 1.46–4(d)(4), Income Tax Regs.,[9] section 46(e)(3) has been amended twice.[10] In neither of these amendments, however, did Congress either make substantive changes in the statute or criticize in the legislative history respondent's definition of a lease for the purposes of section 46(e)(3). Accordingly, respondent argues that the proposed definition contained in section 1.57–3(d)(1), Proposed Income Tax Regs., is controlling because the Supreme Court declared in *Helvering v. Winmill*, 305 U.S. 79, 83 (1938), that:

---

[9]Sec. 1.46–4(d)(4), Income Tax Regs., was adopted on Aug. 25, 1972. T.D. 7203, 1972–2 C.B. 12.

[10]See Technical Corrections Act of 1979, Pub. L. 96–222, 94 Stat. 194, and Economic Recovery Tax Act of 1981, Pub. L. 97–34, 95 Stat. 172, 228.

Treasury regulations * * * long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law. [Fn. ref. omitted.]

While respondent has advanced several arguments as to why the definition of "lease" contained in section 1.57–3(d)(1), Proposed Income Tax Regs., is controlling, neither party addressed the critical concern, i.e., the effect given proposed regulations. As we have previously held, proposed regulations "carry no more weight than a position advanced on brief by the respondent." *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265–1266 (1970). See also *Scott v. Commissioner*, 84 T.C. 683 (1985). Therefore, while the applicable legislative history may confirm the language contained in section 1.46–4(d)(4), Income Tax Regs., and such language may receive additional support due to its longevity and deference to its promulgator, none of respondent's arguments can alter the indisputable fact that section 1.46–4(d)(4), Income Tax Regs., merely cross-references section 1.57–3(d)(1), Proposed Income Tax Regs., for the definition of "lease." As the definition of "lease" contained in section 1.57–3(d)(1), Proposed Income Tax Regs., has remained in the proposed stage for over 14 years, it also "carr[ies] no more weight than a position advanced on brief by the respondent." *F.W. Woolworth Co. v. Commissioner, supra.* Therefore, the definition of lease contained in section 1.57–3(d)(1), Proposed Income Tax Regs., does not have the effect of law as respondent contends.

As for what constitutes a lease for section 46(e)(3) purposes, we agree with respondent that Congress has delegated this responsibility to the Secretary of the Treasury or his delegate. Secs. 38(b) and 7701(a)(11)(B). For reasons unbeknown to us, however, more than 14 years have elapsed and the definition still remains in the proposed stage. Under these circumstances, we decline to usurp the delegation of responsibility bestowed upon the Secretary or his delegate by defining this term for them.

Petitioners contend that the agreements in issue are joint venture agreements and not leases. Petitioners, however, concentrate the bulk of their efforts on showing that these agreements are not leases, and devote less time to showing that they are joint venture agreements. Relying heavily on

*Meagher v. Commissioner*, T.C. Memo. 1977–270, petitioners maintain that the agreements between Freesen, Inc., and Freesen Equipment Co. are not leases under both the control and risk of loss tests contained therein. Although *Meagher* concerned whether an agreement constituted a lease or management contract, petitioners assert that *Meagher* is relevant in that it "tells us what a lease is not." In this regard, petitioners claim that Freesen Equipment Co. "exercised *Meagher* type control over the Joint Venture." Further, petitioners contend that Freesen Equipment Co. "exercised significant non-*Meagher* type control of the joint venture by maintaining possession of its equipment and serving an active, daily, ongoing role in the Joint Venture." Petitioners also claim that Freesen Equipment Co. bore a real risk of economic loss under the joint venture agreements as its compensation was strictly contingent on, and proportional to, economic success, and it was liable for joint venture losses in the same proportion as profits.

In *Amerco v. Commissioner*, 82 T.C. 654, 670 (1984), which dealt with whether an agreement constituted a lease or management contract for investment tax credit purposes,[11] and other cases,[12] this Court recognized that two key factors indicate the existence of a management contract: (1) Control over the venture by the property owner, and (2) risk of loss on the property owner. *State National Bank of El Paso v. United States*, 509 F.2d 832 (5th Cir. 1975); *Kingsbury v. Commissioner*, 65 T.C. 1068 (1976). In the absence of such factors, we have characterized the agreements as leases. *Amerco v. Commissioner, supra.*[13] In making this determination, the substance of the underlying transaction, and not the form of the contract, itself, controls its interpretation for tax purposes. We must consider all of the facts and surrounding circumstances in order to determine the intent of the parties as revealed in their actions and statements and the overall economic realities of the transaction. *Amerco v. Commissioner, supra* at 670; *Kingsbury v. Commissioner, supra* at 1085.

[11]In *Amerco v. Commissioner*, 82 T.C. 654, 669 n. 9 (1984), the Court did not consider the issue present in the immediate case, i.e., whether the agreements in issue constituted a joint venture or lease.

[12]The cases include *Meagher v. Commissioner*, T.C. Memo. 1977–270.

[13]See also *Meagher v. Commissioner, supra.*

With respect to the control test, Freesen Equipment Co. did not possess the requisite control over the activities necessary for the performance of the contracts for topsoil removal with Peabody. Rule 142(a). While Freesen Equipment Co. did exercise some minor supervisory functions concerning the maintenance and servicing of its equipment according to the terms of the joint venture agreements, these supervisory activities were limited to its own equipment and hardly amount to the requisite control over the entire *venture*. *Amerco v. Commissioner, supra*; *State National Bank of El Paso v. United States, supra*; *Kingsbury v. Commissioner, supra*. Instead, control over the venture (the performance of the contracts for topsoil removal) rested solely upon Freesen, Inc.'s shoulders according to the joint venture agreements. Freesen, Inc., was designated as the "sponsoring joint venturer" and the Peabody contract was to "be carried out and performed * * * under the direction of the sponsoring joint venturer." Further, Freesen Equipment Co. was not even a party to the Peabody contracts for topsoil removal as these agreements were between Freesen, Inc., and Peabody.

Additional evidence of Freesen Equipment Co.'s lack of control over the venture as a whole (as compared to exercising some minor supervisory and maintenance responsibilities with respect to its equipment) concerns its lack of control over the funds associated with the performance of the Peabody contract. Peabody paid Freesen, Inc., who as the "sponsoring joint venturer," unilaterally designated who was authorized to draw on the accounts into which the Peabody payments were placed.[14] Moreover, the joint venture agreements lack "best efforts" clauses obligating Freesen, Inc., to obtain the maximum hourly usage rate of the equipment in the performance of the contracts for topsoil removal. The lack of such a provision has been interpreted to be indicative of a leasing arrangement (*McNabb v. United States*, an unreported case (W.D. Wash. 1980, 47 AFTR 2d 81–513, 81–1 USTC par. 9143)), while a taxpayer's ability to include such a clause in an

---

[14]We observe, however, the individuals designated to make such withdrawals according to the original joint venture agreements were shareholders of both Freesen, Inc., and Freesen Equipment Co. Nevertheless, the fact that the "sponsoring joint venturer," i.e., Freesen, Inc., retained the right to unilaterally alter such designations is sufficient to support our conclusion that Freesen, Inc., had control over the funds.

agreement with an unrelated entity has been held to support a management contract characterization.[15]

Finally, we observe that many of the above characteristics indicating a lack of control over the venture as a whole by Freesen Equipment Co. also negate any reasonable characterization of the agreements in issue as joint venture agreements. After examining the record, we find the following items supportive of our conclusion that petitioners have failed to prove the existence of a joint venture: Freesen Equipment Co.'s lack of control over the entire topsoil removal operations; Freesen Equipment Co.'s lack of control over funds; and petitioners' failure to adduce evidence indicating that the joint venture status was so represented to third parties. *Luna v. Commissioner*, 42 T.C. 1067, 1077–1078 (1964).

With respect to the remaining risk of loss standard, petitioners have also failed to convince us that they bore a sufficient risk so as to defeat respondent's leasing characterization. Rule 142(a). The contracts for topsoil removal between Peabody and Freesen, Inc., were extremely detailed, providing for adjustments, for example, when the price of diesel fuel increased beyond the price prevailing when the contract was executed. Further, subject to monthly standby provisions whereby Freesen, Inc., was to be compensated for making specified equipment available, Freesen, Inc., was compensated for the use of equipment at hourly and monthly rates. Equipment and labor costs were billed to Peabody by Freesen, Inc., on a monthly basis. Freesen Equipment Co., however, received monthly *advances* from Freesen, Inc., for "equipment usage and the actual costs for service personnel, insurance, taxes, fuel and lubricants, and parts replaced or repaired on vehicles repaired or replaced under the services and maintenance provisions" of the joint venture agreements. Given the monthly *advance* billing procedures for equipment usage contained in the joint venture agreements, we conclude that petitioners were able to insulate themselves from the traditional risks associated with the operation of a business venture, which is indicative of a

---

[15]See *Meagher v. Commissioner, supra.* We also observe that the joint venture agreements are not between totally unrelated parties. The shareholders of Freesen Equipment Co. also owned at least 80 percent of Freesen, Inc.'s outstanding shares during the years in issue. In closely held corporations such as these, the existence of such substantial cross-ownership strongly conflicts with petitioners' claim that the joint venture agreements were the result of arm's-length bargaining.

leasing arrangement. *Amerco v. Commissioner, supra; McNabb v. United States, supra.*

We are mindful that, as with many business ventures, the record often contains elements supporting each party's position. See *Amerco v. Commissioner, supra; McNabb v. United States, supra.* Citing *Meagher v. Commissioner*, T.C. Memo. 1977–270, petitioners correctly observe that if the joint venture agreements are deemed leases for section 46(e)(3) purposes, they are "strange one[s], for the 'lessee' would be required to pay 'rent' only if its use of the property resulted in net profit." The fact, however, that the consideration paid for the use of property is a function of net profits, does not require a finding that a joint venture exists. Cf. sec. 1.761–1(a), Income Tax Regs.; see, e.g., *Grandview Mines v. Commissioner*, 282 F.2d 700 (9th Cir. 1960), affg. 32 T.C. 759 (1959); *Kingbury v. Commissioner, supra; McNabb v. United States, supra.* Further, the mere fact that considerations supportive of a party's position are present in the record does not require a finding in their favor. We must, instead, consider all of the surrounding circumstances in order to determine the intent of the parties as revealed in their actions and statements and the overall economic realities of the situation. *Amerco v. Commissioner, supra* at 670; *Kingsbury v. Commissioner, supra* at 1085. It is in this regard that petitioners have failed to carry their burden of proving the Commissioner's lease characterization to be erroneous.

The final matter concerning the Commissioner's determination that the joint venture agreements constitute leases for section 46(e)(3) purposes is petitioners' claim that this is inconsistent with respondent's stipulation that Freesen Equipment Co. qualified as, and chose to be, "an electing small business corporation" under subchapter S. In support thereof, petitioners assert that for section 1372(e)(5) purposes, the joint venture agreements were not considered leases producing rentals so as to disqualify Freesen Equipment Co.'s subchapter S election for the taxable years in issue. Respondent, in turn, contends that no inconsistency exists as section 1.1372–4(b)(5)(vi), Income Tax Regs., provides that "Payments * * * for the use of personal property do not constitute rents [for purposes of section 1372(e)(5)] if significant services are

rendered in connection with such payments," which respondent claims were present in the immediate setting.

After reviewing the parties' contentions in light of the record, we agree with respondent that there is no inconsistency between the Commissioner's lease determination and respondent's stipulation with respect to Freesen Equipment Co.'s subchapter S status. Petitioners presented sufficient evidence concerning the services rendered by Freesen Equipment Co.'s employees with respect to the leased equipment, e.g., the provision of personnel necessary to supervise the servicing of the equipment and the maintenance of service records, to support a conclusion that such services were "significant" for section 1.1372–4(b)(5)(vi), Income Tax Regs., purposes.[16] Accordingly, the Commissioner's determination that the joint venture agreements are leases for section 46(e)(3) purposes is sustained. Rule 142(a).

The next issue for decision is whether the method by which Freesen Equipment Co. leased the heavy construction equipment to Freesen, Inc., satisfied the noncorporate lessor provisions of section 46(e)(3). The Commissioner's determination that the arrangement did not qualify under section 46(e)(3) is presumptively correct (*Welch v. Helvering*, 290 U.S. 111, 115 (1933)), and petitioners bear the burden of proving it to be erroneous. Rule 142(a).

As discussed above, section 46(e)(3)[17] contains several qualification requirements concerning a noncorporate lessor's entitlement to investment tax credit with respect to the leased property. The parties agree that petitioners' entitlement to investment tax credit with respect to the heavy construction equipment purchased by Freesen Equipment Co. is tied to their satisfaction of the provisions of section 46(e)(3)(B). Further, the parties agree that the term of the leasing transaction[18] existing between Freesen Equipment Co. and Freesen, Inc., is less than 50 percent of the useful life of the leased property for section 46(e)(3)(B) purposes. The parties disagree, however, whether the statutory section 162 expense limitations contained in section 46(e)(3)(B) have been satisfied. In

[16]See also *Lausmann v. Commissioner*, T.C. Memo. 1978–420.

[17]See note 7 *supra*.

[18]This designation follows from our holding for respondent that the joint venture agreements are leases for sec. 46(e)(3) purposes.

this regard, a noncorporate lessor qualifies for the investment tax credit allowed by section 38, only if:

for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (*other than rents and reimbursed amounts with respect to such property*) exceeds 15 percent of the rental income produced by such property. [Emphasis added.]

The parties' disagreement stems from differing interpretations of paragraph III.B. of the joint venture agreements which provide that:

[Freesen] Equipment Co. shall bill [Freesen] Inc. monthly for advances on equipment usage and the actual costs for service personnel, insurance, taxes, fuel and lubricants, and parts replaced or repaired on vehicles repaired or replaced under the services and maintenance provisions of this agreement. [Freesen] Inc. shall pay [Freesen] Equipment Co. for such billings on a monthly basis.

Although respondent concedes that Freesen Equipment Co. was the entity which forwarded remuneration to third parties for section 162 expenses in a total sum during the relevant period in excess of the 15-percent limitation contained in section 46(e)(3)(B), respondent, nevertheless, contends that all of these section 162 expenditures constituted nonqualifying "reimbursements" under section 46(e)(3)(B) as the result of the advance billing clauses of the joint venture agreements. In support thereof, respondent observes that section 1.46–4(d)(3)(ii), Income Tax Regs., which was promulgated with explicit congressional authority under section 38(b), defines a "reimbursed amount" for section 46(e)(3)(B) purposes as "any expense for which the lessee or some other party is obligated to reimburse the lessor." Further, section 1.46–4(d)(3)(iii), Income Tax Regs., provides that "For purposes of the more-than-15-percent test, the gross income from rents of the lessor produced by the property is the total amount which is payable to the lessor by reason of the lease agreement other than reimbursements of section 162 expenses." Respondent, therefore, contends that Freesen Equipment Co.'s "gross income" for section 46(e)(3)(B) purposes is its share of the net profits, as computed under paragraph III. C. of the joint venture agreements. Yet, because Freesen Equipment Co. did not pay any

section 162 expenses with any funds other than those received under the advance billing clauses, respondent asserts that Freesen Equipment Co. had no nonreimbursed section 162 expenses; hence, petitioners are not entitled to their claimed investment tax credit.

Petitioners assert that the method by which Freesen Equipment Co. leased the heavy construction equipment to Freesen, Inc., fully satisfied the noncorporate lessor provisions of section 46(e)(3)(B). In support of their contention that the advances payable to Freesen Equipment Co. under paragraph III. B. of the joint venture agreements satisfied these requirements, they characterize these advances as:

merely advances of profits under the agreement which enable [Freesen] Equipment Company to meet current expenses. The §162 expenses paid by [Freesen] Equipment Company (and those paid by Freesen, Inc.) were fully deducted from the gross receipts in determining net profit. The parties then divided the net profit according to the formula of paragraph III C. It would seem that a true reimbursed expense should be one that, as to the party reimbursed, did not affect that parties [sic] share of profits of losses.

In this regard, petitioners contend that respondent's analysis ignores the fact that all of the joint venture expenses were paid out of joint venture revenues.

We have already concluded that the joint venture agreements constitute leases for section 46(e)(3)(B) purposes; hence, we must now ascertain whether the more-than-15-percent test with respect to section 162 expenses has been satisfied. As discussed above, section 1.46–4(d)(3)(iii), Income Tax Regs., provides that "For purposes of the more-than-15-percent test, the gross income from rents * * * is the total amount which is payable to the lessor by reason of the lease agreement other than reimbursements of section 162 expenses." Pursuant to paragraph III. C. of the joint venture agreements, the total amount payable to the lessor, Freesen Equipment Co., is its stated share of the *net profits* (gross revenues less costs including section 162 expenses) resulting from performance of the contracts for topsoil removal. Freesen Equipment Co.'s share of the net profits, therefore, is the gross income figure to be utilized in determining whether the requirements of section 46(e)(3)(B) have been satisfied. Sec. 1.46–4(d)(3)(iii), Income Tax Regs. Yet, as Freesen Equipment Co.'s gross income for section 46(e)(3)(B) purposes is exclusive of any 162 expenses, it clearly

follows that Freesen Equipment Co. did not incur any section 162 expenses for section 46(e)(3)(B) purposes. This is further confirmed by the fact that the advances received by Freesen Equipment Co. under paragraph III. B. of the joint venture agreements were based solely upon the section 162 expenses.

Finally, we observe that the legislative history accompanying the enactment of section 46(e)(3) confirms our conclusion that petitioners are not entitled to their claimed investment tax credit. As we remarked in *Ridder v. Commissioner*, 76 T.C. 867, 872 (1981),

In general, Congress was concerned that individuals might be tempted to use investment credits to finance the acquisition and leasing of depreciable property as tax shelters. S. Rept. 92–437 (1971), 1972–1 C.B. 559, 583. Thus, Congress tried to make investment credits available only to those noncorporate lessors actually using the property in question in an active business. These were determined to be lessors who had themselves manufactured or produced the property, and short-term lessors. Conversely, Congress wanted to deny investment credits to purchaser-lessors involved in mere financing arrangements without the risks and obligations associated with an ongoing trade or business. [Fn. ref. omitted.]

In the instant case, as all of the remuneration forwarded to third parties by Freesen Equipment Co. for section 162 expenses constituted advances of its share of the net profits under the joint venture agreements, it is apparent that the transaction in issue was a "mere financing arrangement" and that petitioners were insulated from the traditional risks and obligations associated with an ongoing trade or business. Accordingly, the Commissioner's disallowance of petitioners' claimed investment tax credit is sustained.

The final issue for decision is whether the heavy construction equipment owned by Freesen Equipment Co. was subject to a lease for the purposes of section 57(a)(3), so as to require that any depreciation claimed by petitioners in excess of straight line be treated as a tax-preference item. In the notices of deficiency mailed to petitioners, the Commissioner determined that such heavy construction equipment was subject to a lease for section 57(a)(3) purposes. The Commissioner's determination is presumptively correct. *Welch v. Helvering*, 290 U.S. 111, 115 (1933), and petitioners bear the burden of proving it to be erroneous. Rule 142(a).

We have already decided that the heavy construction equipment was subject to a lease for section 46(e)(3) purposes and that the transactions in issue failed to satisfy the noncorporate lessor provisions contained therein. The term "lease," as contained in sections 46(e)(3) and 57(a)(3), is not defined by statute. Petitioners' cursory review of this issue offers no convincing reasons why our prior holdings in favor of respondent do not compel a similar result with respect to this issue. Accordingly, based upon the parties' stipulations,[19] the Commissioner's determination that such accelerated depreciation deductions constitute items of tax preference is sustained. Rule 142(a).

*Decision will be entered under Rule 155.*