CHARLES A. NIGH AND JOAN NIGH, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Nigh v. Commissioner
Docket Nos. 12424-88, 12437-88, 12438-88, 12441-88, 12541-88
United States Tax Court
T.C. Memo 1990-349; 1990 Tax Ct. Memo LEXIS 361; 60 T.C.M. (CCH) 91; T.C.M. (RIA) 90349; July 10, 1990, Filed *361 Decision will be entered for the petitioner in docket No. 12541-88.
Decisions will be entered under Rule 155 for the remaining dockets. Charles M. Lock and Glenn L. Strong, for the petitioners. Robert J. Burbank, for the respondent. CLAPP, Judge. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined the following deficiencies in and additions to the individual petitioners' Federal income taxes: Addition to tax Docket No.
Petitioner
Year
Deficiency
sec. 6661
12424-88
Nigh
1980
$ 13,968
--
1981
11,923
--
1982
12,331
$ 3,083
12437-88
Dolan
1980
13,823
--
1981
23,592
--
1982
13,072
3,268
12438-88
Ballal
1980
14,119
--
1981
11,990
--
1982
11,370
2,843
12441-88
Fogarty
1980
14,259
--
1981
13,218
--
1982
13,036
3,259 Respondent also determined in a notice of final S corporation administrative adjustment (docket No. 12541-88) that the corporate petitioner had no loss or investment tax credit as an S corporation in 1983 and 1984. After concessions, the issues are (1) whether the corporate petitioner's election under section 1372 was terminated in 1980 due to its failure to meet the requirement of section 1372(e)(5) regarding passive investment income; (2) if not, whether the individual petitioners' bases in the corporate *362 petitioner under section 1374(c)(2)(A) included the amount of certain loans; and (3) whether the individual petitioners are liable for the section 6661 addition to tax. All section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. All petitioners were located in or resided in Missouri when they filed their petitions. Petitioner wives are petitioners only because they filed joint returns with their husbands. All subsequent references to "petitioners" will be to the petitioner husbands. Each petitioner has owned 25 percent of the stock in Southwest Barge Company (Southwest), a calendar year taxpayer, since its incorporation in 1979. In the year of its incorporation, Southwest filed a timely election to be taxed as a small business corporation under section 1372. Southwest owns three covered hopper barges. It purchased the first barge for $ 260,000 in October 1979, the second for $ 285,000 in December 1980, and the third for $ 90,000 in September or October 1984. The payments on the first and *363 second barges consisted in part of the proceeds of $ 220,000 and $ 240,000 loans, respectively, from Hampton Metro Bank. The payment on the third barge consisted in part of a $ 80,000 loan from Centerre Bank. The loans on the first two barges were pursuant to notes signed by Southwest and the petitioners as co-makers, and on the third barge by petitioners as individuals. The barges were collateral on all of the loans. The standard policy of Hampton Metro Bank and Centerre Bank regarding loans to closely held corporations was to require guarantees of the stockholders and their spouses. The banks would not have made loans to Southwest without the signatures of petitioners, and it considered liability for the loans to be on petitioners. Petitioners had to submit annual financial statements to the banks, but no such statement was required from Southwest. The bank had the right to go against petitioners before repossessing the collateral. During some of the leaner years in the barge business, petitioners personally contributed to Southwest the funds to pay the indebtedness each month. Each barge was managed until June 1981 by Robert B. Miller and thereafter by Robert B. Miller & *364 Associates, Inc. Both Miller and his corporation will be referred to as "Miller." Miller was in the business of arranging for the shipment of cargo by barges on Midwestern rivers. Miller owned nothing except desks, telephones, an automobile, and some minor office fixtures. Miller manages 8 to 10 different pools of barges. The pool into which a barge is placed depends upon its management contract. All barges with similar management contracts are placed in the same pool, while barges with dissimilar management contracts are placed in different pools. Management contracts differ regarding cargoes to be carried, areas of operation, management fees, and insurance requirements. If a barge owner wished to have a management contract unlike that of other barge owners, his barges would be placed in a pool of their own. Southwest's barges were placed in a pool whose size ranged from a low of 4 barges in 1979 to nearly 200 barges several years later. The earliest document in evidence which confirms the placement of a barge with Miller is a December 20, 1979, letter in which Miller advised Southwest that earnings would be calculated for the 3 months ending December 31, 1979, and that barge *365 owners were required to have a $ 3,000 reserve to prepay expenses incurred prior to receipt of revenues. The earliest management agreement in evidence was executed in November 1980. Subsequent agreements were executed with Miller in February 1981, May 1983, and March 1984. Most of the agreements were for a period of 1 year. The prior agreement controlled if there was a time gap between agreements. The management agreements provided that Miller would use his best efforts to arrange for the employment of the barges in any lawful trade by responsible barge users. Upon request, he would provide petitioners with full information regarding each use of the barge, including type of freight, points between which the freight was to be shipped, expected duration of each use, and anticipated revenues. Miller would make all arrangements for cargo bookings, towing, dockage, and the like, and would collect all income from the barges, such as freight revenues and charter income. He also would maintain the barges in good condition, including repairs, cleaning, and painting, and would keep records of all income and expenses. Petitioners agreed to keep hull insurance, cargo insurance, and protection *366 and indemnity, naming Miller as co-assured. Petitioners could terminate the agreements in the event the barges were not gainfully employed for 60 days during a year. The management agreements provided that Miller would pool all of the income and many of the expenses of the barges in petitioners' pool. The expenses that were pooled included towing, harbor shifting, cleaning, minor repairs, cargo insurance, inspection reports, and office expenses. Expenses paid directly by the owners included hull insurance, property indemnity insurance, excess liability insurance, water pollution insurance, general painting of the barge, and major repairs. Petitioners received their share of the gross operating profits of the pool, which equalled gross revenues minus all pooled expenses including the management fee due Miller. Miller's management fee equalled 2-1/2 percent of gross revenues, and Miller also was reimbursed for all expenses for labor, telephone, printing, postage, stationery, office rent, and travel. Miller also kept a reserve fund of $ 3,000 per barge to cover expenses. Income usually exceeded the pooled expenses, so Miller rarely had to use the reserve fund. Shippers contracted *367 with Miller to have their cargo hauled from one point to another. The largest shippers of cargo on Southwest's barges were the major grain exporters. Other shippers were fertilizer producers, iron and steel shippers, various chemical companies, sand and gravel companies, quarries, and coal companies. The contracts or letters that Miller used to confirm a deal with a shipper listed Miller rather than Southwest as the party contracting to ship the cargo. However, shippers were aware that Miller managed barges owned by others. Shippers had no control over the actual shipping process. Generally, a barge would be used to transport the cargo of a single customer on a single trip, which could last from 20 to 70 days. Miller maintained logs of the voyages of the barges, and provided Southwest with quarterly statements reflecting income and expenses. Miller also spoke with petitioners two or three times each month, and wrote them a monthly letter in which he described the conditions of the river industry, the level of freight rates, and anything that might affect their investment such as adverse navigating conditions on the rivers or an announcement of a grain sale to a foreign country. *368 In this letter, Miller included a check for the earnings for the month. Petitioners also frequently called Miller with questions about freight rates, the condition and value of their barges, and future trends in the industry. The barge industry was very profitable during 1979 and 1980, but became unprofitable in 1981 due to a grain embargo, overbuilding in the industry, and a general economic downturn. OPINION The issues are (1) whether Southwest's election under section 1372 was terminated in 1980 due to its failure to meet the requirement of section 1372(e)(5) regarding passive investment income; (2) if not, whether petitioners' bases in Southwest under section 1374(c)(2)(A) included their guarantees of Southwest's debts to third-party lenders; and (3) whether the individual petitioners are liable for the addition to tax under section 6661 for 1982. In 1979, Southwest elected under section 1372(a) to be treated as a small business corporation whose undistributed taxable income and net operating loss would be passed through to its shareholders. Secs. 1373 and 1374. This election would terminate, with an exception not relevant here, in any taxable year in which more than 20 percent *369 of Southwest's gross receipts were passive investment income. Sec. 1372(e)(5)(A) and (B). Passive investment income includes gross receipts from rents. Sec. 1372(e)(5)(C). Rents are "amounts received for the use of, or right to use, property." Sec. 1.1372-4(b)(5)(vi), Income Tax Regs.
Respondent argues that Miller was renting the barges from petitioners, causing all of Southwest's income to be passive investment income. This would have terminated Southwest's election under section 1372(a), preventing petitioners from reporting Southwest's losses on their individual returns for any of the years at issue. By contrast, petitioners argue that Southwest was not renting the barges to Miller but that Miller was Southwest's agent. This would mean Southwest had no passive investment income and its election under section 1372 was not terminated in any year. In determining whether a contract establishes an agency arrangement or a lessor-lessee arrangement, we look to the substance of the underlying transaction rather than the form of the contract. We consider all of the facts and circumstances in order to determine the intent of the parties as revealed in their actions and statements and *370 the overall economic realities of the transaction. The key factors which indicate the existence of an agency arrangement rather than a lease are control over the venture by the property owner and risk of loss on the property owner. Amerco v. Commissioner, 82 T.C. 654, 670 (1984). The case whose facts are closest to those of the instant case is Meagher v. Commissioner, T.C. Memo. 1977-270, which involved the question of whether for purposes of section 46(d)(3) (now section 46(e)(3)) a railroad tank car was leased or was subject to a management contract. The taxpayers purchased the tank car in 1971, and entered into a "management agreement" with Relco Tank Line, Inc. (Relco). Relco agreed to use its best efforts to arrange for the leasing of the tank car and to perform all managerial and administrative functions necessary to the operation of the car, including collection of revenues, repairs and maintenance, and keeping adequate records of operations. In return, the taxpayers agreed to pay Relco a quarterly management fee equivalent to 35 percent of the operating profit generated by the tank car. Operating profit was defined as income generated from the operation of the tank car *371 minus the costs and expenses of its operation. Income and expenses would be pooled with the owners of other tank cars. The taxpayers agreed to defend, indemnify, and hold Relco harmless from and against any and all loss, damage, or liability. Further, to cover its expenses, Relco would maintain a $ 200 cash reserve that would be deducted from net earnings payable to the taxpayers and other owners of tank cars. The taxpayers agreed to reimburse Relco for the amount of any expenses incurred by the taxpayers' car in excess of the amount set aside in the reserve. The contract had a minimum term of 10 years, and then could be terminated by either party. We noted that the taxpayers did not directly control Relco's leasing activities, but did exercise a degree of control over the venture at the outset through the provisions in the agreement. We further noted that the risk of loss rested squarely on the taxpayers' shoulders as they agreed to reimburse Relco for the amount of any expenses incurred by the tank car in excess of the $ 200 reserve and to defend, indemnify, and hold Relco harmless from all risk of loss or damage to the tank car, as well as all claims asserted against Relco as *372 a result of its operation of the tank car. Finally, we stated that if the agreement "were held to be a lease it would be a strange one, for the 'lessee' would be required to pay 'rent' only if its use of the property resulted in net profit." We concluded that the taxpayers assumed the risks of a normal business transaction, and that the agreement was properly characterized as a management contract. The facts in the instant case are even more favorable to petitioners than those in Meagher. First, the management fee in the instant case was calculated as a percentage of gross revenues, while in Meagher it was calculated as a percentage of income minus expenses. Accordingly, Relco had an interest in operating profits while Miller does not. Second, Relco had a right to paint its name on the tank cars, yet Miller had no right to paint his name on the barges. Third, in the event that the taxpayers in Meagher decided to sell the tank car, Relco had a right of first refusal to purchase the car. Miller had no such right. Fourth, the taxpayers could terminate the agreement only after it had been in effect for 10 years. By contrast, Southwest could terminate the agreement at the end of each *373 year or if the barges were not used for 60 days during a year. All of these factors suggest that Miller had even less of an interest in the barges than Relco had in the tank car, making the relationship in the instant case more like a management contract and less like a lease. Respondent urges us to follow Amerco v. Commissioner, 82 T.C. 654 (1984), in which we held that a lease rather than an agency relationship existed for purposes of section 48(d)(1). In that case, "fleet owners" owned equipment that was used by the U-Haul rental system, an Amerco subsidiary. The facts of Amerco are unlike those of the instant case. First, the fleet owners had virtually no control over the operations of U-Haul. Their agreement with U-Haul ostensibly gave them the right to enter the premises on which their equipment was being displayed for purposes of determining whether the dealer was properly displaying the vehicle and accurately reporting rental income. However, this right was illusory because the fleet owners could neither designate, nor were they informed, of the locations where their equipment would be displayed. By contrast, Miller was in frequent contact with petitioners. The fact *374 that petitioners chose to leave all decisions to Miller indicates not that they were unable to control the use of their barges, but that they chose not to do so. If petitioners had disagreed with Miller's management decisions, Miller would have followed their wishes. Second, U-Haul had a standard contract which all fleet owners had to sign. By contrast, Miller had a number of different contracts with barge owners and would have formed a separate pool for an owner who wished to use still another contract. Third, the risk of loss on the fleet owners in Amerco was limited. Their liability for operating expenses could not exceed their gross rental income, and U-Haul agreed to hold fleet owners harmless from all damages and liability arising out of the operation of the rental equipment. In the instant case, the risk of loss was on petitioners, not on Miller. Respondent also urges us to follow Freesen v. Commissioner, 84 T.C. 920 (1985), revd. on other grounds 798 F.2d 195 (7th Cir. 1986). In that case, a subchapter S corporation owned construction equipment that was used by another corporation for the removal of topsoil. We held that for the purpose of section 46(e)(3) the agreements *375 between the corporations were joint venture agreements rather than leases. We noted that while the subchapter S corporation maintained some minor supervisory functions concerning the maintenance and servicing of its equipment, the other corporation exercised sole control over the topsoil venture. In addition, the subchapter S corporation insulated itself from the risk of loss. Accordingly, Freesen is inapplicable to the instant case. Respondent makes several other arguments. One is that for purposes of determining risk of operating loss we should ignore most of Southwest's expenses (including repayments on the loans) because those expenses would be incurred regardless of whether Southwest rented the barges to another party or used the barges in its own business. Accordingly, respondent concludes, Southwest had no risk of loss since virtually any level of revenue would be greater than its minimal expenses. This argument makes no sense because it implies that a business with constant costs but fluctuating revenues has no risk of loss. Respondent's other arguments are similarly unconvincing and will not be discussed here. In conclusion, we find that Miller was the management agent *376 for Southwest in carrying out the business activities. We see little difference between a large barge operation that has a full-time employee who manages its barges and a small operation such as Southwest that hires a contractual part-time manager such as Miller. In both cases, the manager is working for the barge owner, and his activities should be attributed to the barge owner. Accordingly, Southwest was not receiving passive investment income within the meaning of section 1372(e)(5). The second issue facing us is whether petitioners' bases in Southwest under section 1374(c)(2)(A) included the amount of the loans incurred to purchase the barges. Section 1374 provided that shareholders of an electing small business corporation may deduct their respective portions of the corporation's net operating loss, but that their portions shall not exceed the sum of their bases in the corporation and in Southwest's indebtedness to them. Section 1374(c)(2). Petitioners argue that as comakers of Southwest's loans they had in substance borrowed funds and made contributions to Southwest's capital that increased their basis in Southwest's stock. Sec. 1374(c)(2)(A). As support for their position, *377 petitioners cite Selfe v. United States, 778 F.2d 769 (11th Cir. 1985), and the dissenting opinion in Estate of Leavitt v. Commissioner, supra.90 T.C. 206 (1988) (Court reviewed), affd. 875 F.2d 420 (4th Cir. 1989). The problem with petitioner's argument is that it has been previously considered and rejected by this entire Court. Estate of Leavitt v. Commissioner, supra. In Estate of Leavitt v. Commissioner, supra at 216, we said -- We respectfully disagree with the 11th Circuit and hold that a shareholder's guarantee of a loan to a subchapter S corporation may not be treated as an equity investment in the corporation absent an economic outlay by the shareholder.
In the instant case, petitioners were co-makers rather than guarantors, but this does not change our analysis. See Estate of Leavitt v. Commissioner, supra at 212-218. Accordingly, we reject petitioners' argument with respect to the 1979 and 1980 loans. The parties do agree that petitioners are entitled to basis for the funds they personally contributed to Southwest to pay the loans. Southwest is the only petitioner for the 1983 and 1984 years, so our jurisdiction for that year extends only to subchapter S items. *378 Sec. 6241. Subchapter S items do not include a shareholder's basis in the stock of an S corporation. Sec. 301.6245-1T(c)(3), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 3003 (Jan. 30, 1987). The question of the shareholders' bases resulting from the 1984 loan is the only issue before us for these years. Accordingly, we lack jurisdiction to determine the effect of the 1984 loan upon petitioners' bases in their Southwest stock. See Dial USA, Inc. v. Commissioner, 95 T.C. (1990); see also Roberts v. Commissioner, 94 T.C. (1990). The remaining issue is petitioners' liability in 1982 under section 6661, which imposes an addition to tax in the case of a substantial understatement of income tax. We conclude that petitioners are not liable for the section 6661 addition because they prevailed on the passive investment income issue and there is or was substantial authority for their treatment of their bases in their stock under section 1374(c)(2)(A). Sec. 6661(b)(2)(B)(i). Section 1.6661-3, Income Tax Regs., provides -- (a) General rule. -- * * * (2) Substantial authority standard. The substantial authority standard is less stringent than a "more likely than not" standard (that *379 is, a greater than 50-percent likelihood of being upheld in litigation) but stricter than a reasonable basis standard (the standard which, in general, will prevent imposition of the penalty under section 6653(a), relating to negligence or intentional disregard of rules and regulations). Thus, a position with respect to the tax treatment of an item that is arguable but fairly unlikely to prevail in court would satisfy a reasonable basis standard, but not the substantial authority standard.
(b) Determination of whether substantial authority is present -- (1) Evaluation of authorities. There is substantial authority for the tax treatment of an item only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions. All authorities relevant to the tax treatment of an item, including the authorities contrary to the treatment, are taken into account in determining whether substantial authority exists * * *. The authorities cited by petitioners are Selfe v. United States, supra, and the dissenting opinion in Estate of Leavitt v. Commissioner, supra. We believe that the opinion of the Court of Appeals in Selfe *380 has substantial weight in relation to the weight of contrary authorities and, accordingly, hold that petitioners are not liable for the section 6661 addition to tax. Decision will be entered for the petitioner in docket No. 12541-88. Decisions will be entered under Rule 155 for the remaining dockets. Footnotes
1. Cases of the following petitioners are consolidated herewith: John T. Dolan, Jr., and Donna P. Dolan, docket No. 12437-88; Hebri S. Ballal and Mallika Ballal, docket No. 12438-88; William M. Fogarty and Joanne D. Fogarty, docket No. 12441-88; and Southwest Barge Company, Hebri S. Ballal, Tax Matters Person, docket No. 12541-88.↩